UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

POST UNIVERSITY, INC.,

                Plaintiff,

    v.

LEARNEO, INC.,

                Defendant.

Case No. 3:21-cv-01242

**DEFENDANT LEARNEO, INC.'S MOTION TO STRIKE**

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION .................................................................................................... 1

II.    FACTUAL AND PROCEDURAL BACKGROUND ......................................... 2

    A.    Dr. Wind's Opening Report ....................................................................... 2

    B.    Learneo's Attempts to Understand the Basis for Dr. Wind's Opinions in
        the Opening Report ...................................................................................... 8

    C.    Dr. Wind's Rebuttal Report ...................................................................... 11

        1.    Dr. Wind's New CMI Methodology Relating to Figure 6 ...................... 12

        2.    Dr. Wind's New Analysis Relating to Rebuttal Report Figure 6 and
            the Associated Exhibits ...................................................................... 17

        3.    The Impact of Dr. Wind's New CMI Methodology and Analysis ......... 18

    D.    Learneo's Objections to Dr. Wind's Rebuttal Report and Attempts to
        Avoid Motion Practice ............................................................................. 20

III.   LEGAL STANDARD .......................................................................................... 21

IV.    ARGUMENT ....................................................................................................... 23

    A.    Dr. Wind's New CMI Methodology and Analysis Violates the Scheduling
        Order ......................................................................................................... 23

        1.    Dr. Wind's New CMI Methodology and Analysis Is in Violation of
            Rule 26(a)(2)(B)(i) ........................................................................... 23

        2.    Dr. Wind's New CMI Methodology and Analysis Is Not a
            Permissible Supplement Under Rule 26(e) ....................................... 24

            a.    Dr. Wind's New CMI Methodology and Analysis Is Not
                Based on Previously Unknown or Unavailable Information ....... 24

            b.    Dr. Wind's New CMI Methodology and Analysis Is an
                Illicit Attempt to Bolster His Opening Report Opinions ............. 26

            c.    Dr. Wind's New CMI Methodology and Analysis Cannot
                Be Analogized to Cases Where Supplementation Was
                Permitted ................................................................................... 28

    B.    The New CMI Methodology and Analysis Should Be Stricken ........................ 30

        1.    The New CMI Methodology and Analysis Is Not Substantially
            Justified ............................................................................................ 30

        2.    Consideration of All the *Softel* Factors Weighs in Favor of
            Preclusion ........................................................................................ 31

V.     CONCLUSION .................................................................................................... 32

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Anderson Grp., LLC v. City of Saratoga Springs*,
   No. 1:5-cv-1369, 2010 WL 8357263 (N.D.N.Y. May 28, 2010) ...........................................26

*Buxton v. Lil' Drug Store Prods., Inc.*,
   No. 2:02CV178KS–MTP, 2007 WL 2254492 (S.D. Miss. Aug. 1, 2007),
   *aff'd*, 294 Fed. Appx. 92 (5th Cir. 2008) ................................................................22

*Coene v. 3M Co.*,
   303 F.R.D. 32 (W.D.N.Y. 2014)................................................................................22, 28

*Gyllenhammer v. Am. Nat'l Red Cross*,
   No. 3:15-CV-1143 DEP, 2018 WL 1956426 (N.D.N.Y. Jan. 23, 2018)................................26

*Hernandez v. Money Source Inc.*,
   No. 17-CV-6919 (GRB)(AYS), 2022 WL 2702894 (E.D.N.Y. July 12, 2022) .....................31

*Innis Arden Golf Club v. Pitney Bowes, Inc.*,
   No. 3:06 CV 1352(JBA), 2009 WL 5873112 (D. Conn. Feb. 23, 2009)........................ *passim*

*Lab Crafters, Inc. v. Flow Safe, Inc.*,
   No. CV–03–4025 (SJF)(ETB), 2007 WL 7034303 (E.D.N.Y. Oct. 26, 2007) .....................23

*Levinson v. Westport Nat. Bank*,
   No. 3:09-CV-1955 (VLB), 2013 WL 3280013 (D. Conn. June 27, 2013)...........................22

*Lidle v. Cirrus Design Corp.*,
   No. 8 Civ. 1253(BSJ)(HBP), 2009 WL 4907201 (S.D.N.Y. Dec. 18, 2009) ........................25

*Mobius v. Quest Diagnostics Clinical Lab'ys, Inc.*,
   No. 1:19-CV-00499, 2023 WL 5314557 (W.D.N.Y. Aug. 18, 2023) ...................................25

*On Track Innovations, Ltd. v. T-Mobile USA, Inc.*,
   No. 12-CV-2224 (AJN), 2015 WL 14072083 (S.D.N.Y. July 24, 2015)...................22, 25, 28

*Outley v. City of New York*,
   837 F.2d 587 (2d Cir. 1988)....................................................................................23

*Softel Inc. v. Dragon Med. & Scientific Comm., Inc.*,
   118 F.3d 955 (2d Cir. 1997)............................................................................... *passim*

*In re Thilman*,
   557 B.R. 294 (Bankr. E.D.N.Y. 2016)........................................................................26

*Wechsler v. Hunt Health Sys., Ltd.*,
  381 F. Supp. 2d 135 (S.D.N.Y. 2003) ............................................................................ *passim*

**Statutes**

17 U.S.C. § 1202 ............................................................................................................... 3, 4

**Other Authorities**

Fed. R. Civ. P. 26(a) ......................................................................................... *passim*

Fed. R. Civ. P. 26(e) ......................................................................................... *passim*

Fed. R. Civ. P. 37(c)(1) ............................................................................. 1, 24, 32

## TABLE OF ABBREVIATIONS

| Abbreviation | Full Name | Exhibit No. |
|---|---|---|
| CMI | Copyright Management Information | N/A |
| Exhibit 4-3 | Table from Dr. Wind's Rebuttal Report identifying the percentage point change between the Opening Report Figure 6 and the Rebuttal Report Figure 6 | Ex. J at 2 |
| Figure 4-3 | Summary table from Dr. Wind's Rebuttal Report identifying the percentage point change between the Opening Report Figure 6 and the Rebuttal Report Figure 6 | Ex. F at 14 |
| New CMI Methodology and Analysis | Dr. Wind's new reporting methodology as to how to count someone as confused based on CMI introduced in his Rebuttal Report; this methodology newly includes the "Other" CMI category.  As well as Dr. Wind's new red text analysis contained in Appendix 3a of his Rebuttal Report.  Altogether, Dr. Wind's New CMI Methodology and Analysis includes:<br>• Red text provided in Appendix 3a;<br>• Exhibits A-3, B-3, C-2, D-2, and E-3 (and footnote 1) in Appendix 3b;<br>• Figure 6 in Appendix 3c; and<br>• Figure 4-3 in Dr. Wind's rebuttal report and Exhibit 4-3 in Appendix 3d | N/A |
| Opening Report | The Reissued Opening Report of Professor Yoram (Jerry) Wind (February 13, 2024) | Ex. A |
| Opening Report CMI Methodology | • Dr. Wind's Coding Guidelines for Figures 6 and 10 (provided separately on March 6, 2024), which sets out four categories of CMI to code for:  Course Hero Banner Ads<br>• Course Hero Advertisement<br>• Course Hero Copyright<br>• Course Hero Logo<br>(provided separately on March 6, 2024) | Ex. E |
| Opening Report Data Files | Data and Verbatim Responses in Appendix 4(h) of Dr. Wind's Opening Report (provided separately on February 20, 2024) | Ex. D[1] |

[1] Exhibit D is a copy of Dr. Wind's Opening Report Stimuli 2 Test Data File, one of nine separate data files in Appendix 4(h), and is representative of the other data files.

| Opening Report Figure 6 Exhibits | Exhibits A-3, B-3, C-2, D-2, and E-3 in Appendix 5 of Dr. Wind's Opening Report [Reissued February 13, 2024] | Ex. B |
|---|---|---|
| Opening Report Verbatim PDFs | PDFs of "verbatims," i.e., the open-ended responses that respondents gave with the addition of highlighting to indicate responses that were coded as "confused" in Appendix 4g of Dr. Wind's Opening Report [Reissued February 13, 2024] | Ex. C |
| Original Opening Report | The Original Opening Report of Professor Yoram (Jerry) Wind (January 12, 2024) | N/A |
| Rebuttal Report | Rebuttal Report of Dr. Yoram (Jerry) Wind (April 23, 2024) | Ex. F |
| Rebuttal Report Figure 6 | Figure 6 in Appendix 3c of Dr. Wind's Rebuttal Report | Ex. I at 4 |
| Rebuttal Report Figure 6 Exhibits | Exhibits A-3, B-3, C-2, D-2, and E-3 in Appendix 3b of Dr. Wind's Rebuttal Report | Ex. G |
| Red Text Rebuttal Report Verbatim PDFs | PDFs of "verbatims," with additional red text identifying confusion based on CMI in Appendix 3a of Dr. Wind's Rebuttal Report | Ex. H |
| Section 1202(a) | 17 U.S.C. § 1202(a) | N/A |
| Wind Deposition | Excerpts from the Transcript of the Remote Deposition of Dr. Yoram (Jerry) Wind (April 2, 2024) | Ex. K |

Pursuant to Federal Rule of Civil Procedure 37(c)(1), Defendant Learneo, Inc. ("Learneo") moves this Court for an order striking certain portions and related materials of the April 23, 2024 Rebuttal Report of Dr. Yoram Jerry Wind, Plaintiff Post University, Inc. ("Post" or "Plaintiff")'s survey expert.  Specifically, Learneo seeks an order striking materials that constitute new methodology and analysis in the Rebuttal Report that were submitted in contravention of the scheduling order in this case.

Learneo moves to strike the following materials, and any references thereto, from Dr. Wind's Rebuttal Report and to preclude Dr. Wind from offering opinions based on their content (collectively, the "New CMI Methodology and Analysis"), which will be explained in detail below:

- Red text provided in Appendix 3a;

- Exhibits A-3 (including footnote 1), B-3, C-2, D-2, and E-3;

- Figure 6;

- Figure 4-3; and

- Exhibit 4-3.

## I.   INTRODUCTION

More than three months after the date it was required to serve its opening expert reports, Post served what it described as a "supplement" to Dr. Wind's Opening Report that altered Dr. Wind's Opening Report methodology and provided a new analysis to support opinions in Dr. Wind's Opening Report that previously had no supporting analysis.  Under the guise of being a "re-tabulation," Post's actions are an attempt to backdoor **new** methodology and analysis in a misguided effort to bolster unsupported opinions from Dr. Wind's Opening Report without Court approval.

Dr. Wind—and Post—do not have free rein to modify Dr. Wind's Opening Report whenever they choose. The New CMI Methodology and Analysis could have been included with Dr. Wind's Opening Report but were not. Nor is there any legitimate justification for Post's untimely disclosure. Because Learneo is prejudiced by Post's disregard for the deadlines set in the Court's scheduling order, Learneo respectfully requests the Court strike the New CMI Methodology and Analysis and prevent Dr. Wind from testifying as to any information or opinions found in those materials. In short, Learneo seeks only to limit him to the opinions and analysis he provided in his Opening Report on those issues.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

In September 2021, Plaintiff Post University filed this action against Defendant Learneo, alleging that Learneo committed various torts due to the presence of user-uploaded content on Learneo's website "Course Hero." *See* Dkt. No. 1 ¶¶ 80-170; *see also* Dkt. No. 31 ¶¶ 80-173.[2]

### A.   Dr. Wind's Opening Report

Pursuant to this Court's scheduling order, the deadline for serving opening expert reports under Rule 26(a)(2) was January 12, 2024. Dkt. No. 103. As part of that disclosure, Post served the expert report of Dr. Yoram (Jerry) Wind, an expert Post hired to conduct a consumer survey regarding alleged consumer confusion to support Post's claims. *See* Ex. A[3] ("Opening Report"), ¶ 1. Among other things, Dr. Wind provided his opinion in connection with Post's claims under 17 U.S.C. § 1202(a) ("Section 1202(a)"), which prohibits persons from "knowingly and with the intent to induce, enable, facilitate, or conceal infringement (1) provide copyright management information that is false . . . ." *Id.* ¶ 69 (quoting 17 U.S.C. § 1202(a)). Copyright management

---

[2] At the time Post filed its lawsuit, Learneo, Inc. was known as Course Hero, Inc. Learneo changed its name in late 2023. *See* Dkt. Nos. 99, 101.
[3] All exhibits are attached to the Declaration of Melissa Pittaoulis ("Pittaoulis Decl."), unless otherwise noted.

information ("CMI") is certain "information conveyed in connection with copies . . . of a work," including, among other things, "[t]he title," "[t]he name of . . . the copyright owner," or "[t]erms and conditions for use of the work."  *See* 17 U.S.C. § 1202(c).

As is relevant here, Dr. Wind's Opening Report concerns the results of a survey distributed to 1,350 respondents.  Opening Report ¶¶ 11, 93.  The respondents were divided into nine total Test and Control groups of 150 for five survey stimuli, enumerated Stimuli A-E (or occasionally as Stimuli 1-5),[4] which purported to capture "the three life cycle stages of a document that is uploaded by a user of the Course Hero website."  *Id.* ¶ 14; *id.* at 42.  Based on the survey respondents' answers to a set of survey questions relating to these Stimuli, Dr. Wind offered, among other things, opinions allegedly relating to Post's claims under Section 1202(a). *Id.* ¶¶ 68-74, 98, 103.

Dr. Wind opined that (1) Course Hero prospective consumers "are confused, or do not know, the authorship and/or ownership of the Post University documents shown on, or downloaded from, the Course Hero website," (2) "[t]his confusion is mostly due to the Course Hero CMI placed in close proximity to the Post Univerisy [sic] documents," and (3) this alleged confusion "is detrimental to students' academic development and violates the accepted academic integrity standards."  *Id.* ¶ 106.  Dr. Wind claimed that "a significant number of the confused respondents indicated (through open-ended responses) that their confusion was based on one or more of the Course Hero CMI identifiers . . . (i.e., logos, banners, ads, copyright message, watermark, etc.)."  *Id.* ¶ 30.

To reach this opinion, he engaged a third-party marketing research firm company named

---

[4] Dr. Wind acknowledged that the naming convention for Stimuli A-E corresponds with Stimuli 1-5, and that there is "no material distinction" between them.  Declaration of Justin Rezkalla ("Rezkalla Decl."), Ex. K ("Wind Deposition") at 55:20-56:10.

"Illume."  *Id.* ¶ 96.  That company conducted the survey, which asked respondents to provide "open-ended" responses[5] to a series of questions relating to authorship and ownership.  It was Illume—not Dr. Wind—who collected and allegedly analyzed the survey data and prepared the results reflected in the Opening Report and attached to it various exhibits and appendices.  *Id.*; *see also* Rezkalla Decl. Ex. K ("Wind Deposition") at 53:21-54:1.  Illume was also the company that recruited independent coders who coded the open-ended responses of Dr. Wind's survey into categories such as "confused" or "not confused."  Opening Report ¶ 96; Wind Deposition at 49:3-19.

As relevant here, the results of Illume's work were presented by Dr. Wind in his Opening Report Figure 6 (reproduced immediately below), which purported to show the percentage of respondents who identified alleged CMI as the basis for their alleged confusion:

---

[5] This refers to the fact that survey respondents were able to type free-form responses, rather than being provided a pre-set list of potential responses to choose from.  *See* Pittaoulis Decl. ¶ 14.

**Wind Opening Report Figure 6**

<u>**Figure 6**</u>
**Finding 6: Course Hero CMI identifiers are the main reasons for the confusion as to the author and/or owner of the Post University material on, or downloaded from, the Course Hero website**

| Stimuli | % who gave CH CMI identifier[4] as reason for confusion among confused respondents |
|---------|---------------------------------------------------------------|
| A (n=29) | 96.6% |
| B (n=50) | 70.0% |
| C (n=43) | 69.8% |
| D (n=40) | 90.0% |
| E (n=49) | 91.8% |

| Stimuli | % who gave CH CMI Identifier as reason for confusion among the total sample (n=150) |
|---------|---------------------------------------------------------------|
| A | 18.8% |
| B | 23.3% |
| C | 20% |
| D | 24% |
| E | 30% |

Opening Report at 14.  According to Dr. Wind, his conclusion that "Course Hero CMI identifiers are the main reasons for [consumer] confusion" was a "***net of 4 reasons*** – Course Hero logo – Course Hero banner ads, Course Hero advertisements and Course Hero copyright notice." Opening Report at 14 n.4 (emphasis added).

Dr. Wind also provided Exhibits related to Figure 6.  *See* Ex. B (Exhibits A-3, B-3, C-2, D-2, and E-3, or the "Figure 6 Exhibits").  These Figure 6 Exhibits purported to show what percentage of allegedly confused respondents identified each alleged Course Hero CMI as a

basis for their confusion in each of Dr. Wind's test groups.  Representative Exhibit C-2 from Dr.

Wind's Opening Report is below:

**Wind Opening Report Exhibit C-2**

| **Exhibit C-2:** | | |
| --- | --- | --- |
| **Prospective Consumer Confusion As To The Authorship and Ownership Of The Post University Document On The Course Hero Platform Is Partially Due to the Course Hero CMI On Or Near The Post University Documents - Stimuli 3** | | |
| **Based on:** | **Test (n=150)** | **Test – Confused Only (n=43)** |
| Course Hero Logo | 10.0% | 34.9% |
| Course Hero Banner Ads | 0% | 0% |
| Course Hero Advertisement | 6.0% | 20.9% |
| Course Hero Copyright Notice | 6.7% | 23.3% |
| **NET: Course Hero** | **20.0%** | **69.8%** |
| Other | 8.0% | 27.9% |

Ex. B at 17.  As shown in the example above, each of the Opening Report Figure 6 Exhibits lists

out the four alleged types of CMI that form the basis of Dr. Wind's Figure 6 opinion:  logo,

banner ads, advertisements, and copyright notice.  These are the same categories listed in Dr.

Wind's Opening Report.  *See* Opening Report at 14 n.4.  Below those categories, each of the

Opening Report Figure 6 Exhibits includes the line titled "NET: Course Hero" (whose second

and third entries correspond to the numbers shown in Figure 6), and immediately below that, an

"Other" line that is not explained or referenced anywhere in Dr. Wind's Opening Report.  Ex. B.

Dr. Wind also stated in connection with Figure 6 that "[t]he detailed breakdown is

included in the supporting data Appendix 4(h)."  Opening Report at 14 n.4.  However, no

detailed breakdown was provided in Appendix 4(h) (the "Opening Report Data Files"); *see, e.g.*,

Ex. D.  Instead, the Opening Report Data Files merely provided the open-ended responses in

Excel spreadsheets without identification of *any* responses as allegedly showing confusion based

on alleged CMI, let alone *which* type of alleged CMI (i.e., the logo, banners, ads, or copyright

notice) that served as the basis for the opinions in Dr. Wind's Opening Report.  *See* Wind

Deposition at 199:3-21 (referring to Ex. D, Opening Report Data File "Data – Stimuli 2 Test");

Pittaoulis Decl. ¶ 16.

Also produced in connection with Dr. Wind's Opening Report were PDFs of

"verbatims," i.e., the open-ended responses that respondents gave and reflected in the Opening

Report Data Files, but with the addition of yellow highlighting to indicate responses that were

coded as "confused" ("Opening Report Verbatim PDFs").  Ex. C.  For example, an excerpt of the

Opening Report Verbatim PDFs is shown below, demonstrating the "highlighting" that

represents a response that was coded as allegedly "confused":

**Excerpt from Opening Report Verbatim PDFs**

| 129 | Q1 | A format of the tool Course Hero. Like a home page with all the options to choose from |
| | Q1a | It was a home page for course hero |
| | Q2a | Course Hero |
| | Q2b | Because it clearly stated it was from course hero |
| | Q2c | If there was anything else I would have stated it. I don't need to be asked repetitive questions to get a answer. |
| | Q3a | Course hero |
| | Q3b | Because I'm sure it's a licensed company with photo rights |
| | Q4a | Course hero |
| | Q4b | Because that's what it states |
| | Q5a | Social media platforms |
| | Q5b | Because it had the name of the social media platforms |
| | Q6a | The social media platform it was displayed on |
| | Q6b | Bc it clearly stayed that |
| | Q7 | That you have to upload it to access the content |

*Id.* at 4.  While responses were highlighted to show which respondents were counted in

Dr. Wind's survey as "confused," nothing in the Opening Report Verbatim PDFs identified

which responses were allegedly coded as being "confused" based on alleged CMI, let alone

which specific alleged CMI out of the four Dr. Wind's Opening Report identified.  *Id.*; Pittaoulis

Decl. ¶ 18.  The highlighting for "confusion"[6] was the only additional relevant information provided in the Opening Report Verbatim PDFs.  *Id.*

### B.    Learneo's Attempts to Understand the Basis for Dr. Wind's Opinions in the Opening Report

As contemplated by this Court's scheduling order, Learneo provided Dr. Wind's Report to Learneo's rebuttal expert, Dr. Melissa Pittaoulis.  Pittaoulis Decl. ¶ 7.  Dr. Pittaoulis, in reviewing the Opening Report, immediately recognized that certain materials needed to understand Dr. Wind's opinions and methodology were missing.  *Id.* ¶ 8.  Learneo reached out to Post, and, as relevant here, Learneo noted that Figure 6 of Dr. Wind's Opening Report did not appear to have any supporting methodology.  Rezkalla Decl. Ex. L at 16, 18-19.  That is, it was not possible for Learneo's expert to evaluate **what process** Dr. Wind applied to reach the results reflected in Opening Report Figure 6 and the related exhibits.  Pittaoulis Decl. ¶¶ 8-10, 23.

While Dr. Wind stated that open-ended responses were the basis for the numbers reported in Figure 6 and the related exhibits, *see* Opening Report ¶ 30, Dr. Wind's Original Report did not explain the methodology used to identify any alleged "confused" open-ended responses showing confusion based on CMI.  For example, in the respondent 129 response, "Because it clearly stated it was from course hero," from the Opening Report Verbatim PDFs excerpt above, there was no explanation as to how (if at all), that response would have been coded as confused-based-on-CMI.  Ex. C at 4; *see* Pittaoulis Decl. ¶ 19.  Should a given response be counted as confused-based-on-CMI by Illume (and therefore Dr. Wind)?  If so, what type of CMI should it be coded as?  Dr. Wind's Opening Report did not provide the methodology that was allegedly used to determine the result.  *Id.* ¶¶ 18-20.

---

[6] The Opening Report Verbatim PDFs also provided highlighting in green for those counted as "not confused"; however, those responses are not relevant for purposes of this motion.

In response to Learneo's inquiries regarding this missing methodology, Post insisted that "Dr. Wind's report and the supporting materials provide sufficient information to analyze and understand his conclusions."  Rezkalla Decl. Ex. L at 15.  Nevertheless, Post then provided a document that Post represented included the "coding guidelines" for Figure 6 (the "CMI Methodology").  *Id.*; Ex. E.  The Opening Report CMI Methodology—provided over a month after the deadline—was consistent with Dr. Wind's Opening Report regarding the categories of alleged CMI that were allegedly causing confusion.  *See* Opening Report at 14 n.4.  That is, the CMI Methodology stated that there "are **4** concepts to be coded," namely "CH [Course Hero] Banner Ads," "CH Advertisement," "CH Copyright," and "CH Logo."  Ex. E (emphasis added); Pittaoulis Decl. ¶ 21.  There was no mention of an "Other" category.  *Id.*

It was not only Dr. Wind's methodology surrounding Figure 6 that was initially absent. When Dr. Pittaoulis reviewed Dr. Wind's Opening Report, she could not determine what responses were counted that led to the confusion-based-on-CMI result that Dr. Wind reported. Pittaoulis Decl. ¶ 12.  As noted, the appendices attached to Dr. Wind's Opening Report did not contain that information.  *Id.* ¶¶ 16-17.  As a result, Dr. Pittaoulis was unable to review and understand the data that formed the results Dr. Wind reported, let alone determine whether the basis was reliable based on Dr. Wind's methodology (which had not been disclosed at that point).  *Id.* ¶¶ 20, 23.

Learneo brought this to Post's attention multiple times.  Rezkalla Decl. Ex. L at 16, 18-19.  Post's counsel repeatedly assured Learneo that Dr. Wind's materials were complete, that Learneo had everything it needed to understand and respond to Figure 6 of Dr. Wind's Opening Report and the basis for his expressed expert opinions, and that any remaining questions Learneo had would be answered by Dr. Wind at his deposition.  *Id.*  Learneo then proceeded to take Dr.

Wind's deposition.

During his deposition, Dr. Wind confirmed that there were no errors or inaccuracies he needed to correct in his Opening Report.  Wind Deposition at 14:3-11.  Then, when asked about his Opening Report Figure 6, Dr. Wind testified that the materials he provided with his Opening Report should identify "which specific respondents were coded as being confused due to alleged Course Hero CMI," supporting the numbers in Figure 6 of his report and why.  *Id.* at 172:21-173:1.  But when Dr. Wind was shown an example of the contents of the Opening Report Data Files (the Excel files his Opening Report stated should contain the information), he conceded that the tables did not include the analysis necessary to support Figure 6 of his Opening Report.  *Id.* at 199:3-21; *see also* Ex. D.  Dr. Wind testified that the analysis existed, however.  *Id.* at 170:25-173:8.

Because Learneo was never provided the analysis used to support Opening Report Figure 6 (despite having made numerous requests prior to the deposition), Learneo immediately again requested Post's counsel produce it, both during his deposition and, again, in an email on April 5, 2024.  Wind Deposition at 173:10-174:6; Rezkalla Decl. Ex. L at 13.  In response, on April 12, 2024, Post's counsel disclosed that, despite Dr. Wind's sworn testimony to the contrary, "the data does not exist in the format . . . requested."  Rezkalla Decl. Ex. L at 10.

Then, on April 18, 2024, almost three months after the opening report deadline, Post's counsel stated in an email to Course Hero that Dr. Wind is "preparing" materials to support Opening Report Figure 6.[7]  *Id.* at 8-9.  Post notified Learneo that it would be providing these new

---

[7] Post also stated that Dr. Wind would be making "nonmaterial changes" to his coding (unrelated to Learneo's requests regarding Figure 6), altering his Opening Report exhibits and figures.  Rezkalla Decl. Ex. L at 8-9.

materials along with its rebuttal reports on April 23, 2024.[8]  *Id.*  Post did not explain why Dr.
Wind was preparing these materials or what prompted them, other than an implicit recognition of
Learneo's request for the analysis.  In response, Learneo reiterated that it had **only** requested
already-existing materials and that "Dr. Wind is not entitled to create material to support his
opinions that *did not exist prior to his submission of his report*."  *Id.* at 6-8 (emphasis in
original).

### C.       Dr. Wind's Rebuttal Report

Post served Dr. Wind's Rebuttal Report on April 23, 2024.  Ex. F ("Rebuttal Report").

In his Rebuttal Report, Dr. Wind made two significant disclosures that are relevant here.
First, Dr. Wind changed the methodology that was allegedly applied to reach the results he
reported in Opening Report Figure 6 and the Figure 6 Exhibits.  Second, he—for the first time—
disclosed a data analysis to support his opinion that alleged CMI causes consumer confusion, and
in doing so, changed the results he previously reported.

Dr. Wind, in his Rebuttal Report, never explains why he made these changes.  He does
not claim it was due to an error.  He does not claim he learned more information that altered a
previous analysis or that Illume brought coding errors to his attention.  Instead, Dr. Wind only
states, "I directed a re-tabulation of the data underlying the Initial Study presented in my
Opening Report" and that "[t]he conclusions from my Opening Report are re-affirmed and
remain unchanged by this re-tabulation."  Rebuttal Report ¶¶ 29, 34.

Both of these updates alter Dr. Wind's Opening Report relating to the following
Appendices, Figures, and Exhibits:

---

[8] The deadline for serving rebuttal reports was April 19, 2024.  Dkt. No. 126; *see* Dkt. No. 125.  On April 12, 2024,
counsel for Post requested an extension to the rebuttal report deadline to April 23, 2024, and Learneo agreed.
Rezkalla Decl. Ex. M.

- Appendix 3a – Insertion of red text in Appendix 3a purporting to identify which Opening Report responses identify alleged CMI as a basis for their alleged confusion, and which CMI. *See* Rebuttal Report at 12 n.13 and Ex. H.

- Figure 6 Exhibits (and footnote 1) – Change of methodology to include newly added "Other" category in calculating net percentage of Opening Report respondent confusion allegedly attributable to any Course Hero CMI. Revised computations in tables based on the newly added red text coding in Appendix 3a. *See* Rebuttal Report ¶ 30; Ex. G at 5, 11, 16, 21, and 27.

- Figure 6 – Revision of tables to include newly calculated net percentages from Appendix 3b Figure 6 Exhibits based on the red text coding in Appendix 3a, accounting for newly added "Other" category. *See* Rebuttal Report ¶ 33 and Ex. I at 4.

- Rebuttal Report Figure 4-3 and Exhibit 4-3 – Creation of tables, including newly calculated net percentages from Appendix 3b Figure 6 Exhibits based on new methodology and newly added red text coding in Appendix 3a, accounting for newly added "Other" category, and identifying the percentage point change of survey respondent confusion allegedly attributable to any Course Hero CMI from Opening Report Figure 6 to Rebuttal Report Appendix 3c Figure 6. *See* Rebuttal Report at 14 and Ex. J at 2.

      1.      **Dr. Wind's New CMI Methodology Relating to Figure 6**

In his Rebuttal Report, Dr. Wind provided new versions of Figure 6 and the Figure 6 Exhibits. The Rebuttal Report Figure 6 is shown below:

**Rebuttal Report Figure 6**

**Figure 6**
**Finding 6: Course Hero CMI identifiers are the main reasons for the confusion as to the author and/or owner of the Post University material on, or downloaded from, the Course Hero website**

| Stimuli | % who gave CH CMI identifier[1] as reason for confusion among confused respondents |
|---------|-----------------------------------------------------------------------------------|
| A (n=16) | 87.5% |
| B (n=37) | 59.5% |
| C (n=26) | 57.7% |
| D (n=30) | 86.7% |
| E (n=20) | 85.0% |

| Stimuli | % who gave CH CMI Identifier as reason for confusion among the total sample (n=150) |
|---------|-------------------------------------------------------------------------------------|
| A | 9.3% |
| B | 14.7% |
| C | 10.0% |
| D | 17.3% |
| E | 11.3% |

Ex. I at 4.

Dr. Wind's Rebuttal Report Figure 6 changed all of the percentages from those he reported in his Opening Report Figure 6.  *See* Pittaoulis Decl. ¶ 31; *compare* Opening Report at 14 *with* Ex. I at 4.  For example, whereas the second table in Opening Report Figure 6 reports that 30.0% of all test respondents shown Stimuli E were confused, Dr. Wind's new Rebuttal Report Figure 6 indicates this percentage is 11.3%:  *a percent change of over 60%.*  Pittaoulis

Decl. ¶ 33.  These changes are also stated explicitly in Dr. Wind's Rebuttal Report Figure 4-3

and Exhibit 4-3, which compare the Original Report Figure 6 results to the Rebuttal Report

Figure 6 results; Exhibit 4-3 is shown below:

**Rebuttal Report Figure 4-3**

| Stimuli | Results | | |
|---|---|---|---|
| | Original Report<br>Net Confused | Re-Tabulation<br>Net Confused | % change |
| A (Test 1) | Confused respondents only: 96.6%<br>All respondents: 18.7% | Confused respondents only: 87.5%<br>All respondents: 9.3% | **Confused respondents only: -9.1%**<br>**All respondents: -9.4%** |
| B (Test 2) | Confused respondents only: 70.0%<br>All respondents: 23.3% | Confused respondents only: 59.5%<br>All respondents: 14.7% | **Confused respondents only: -10.5%**<br>**All respondents: -8.6%** |
| C (Test 3) | Confused respondents only: 69.8%<br>All respondents: 20.0% | Confused Respondents only: 57.7%<br>All respondents: 10.0% | **Confused respondents only: -12.1%**<br>**All respondents: -10.0%** |
| D (Test 4) | Confused respondents only: 90.0%<br>All respondents: 24.0% | Confused respondents only: 86.7%<br>All respondents: 17.3% | **Confused respondents only: -3.3%**<br>**All respondents: -6.7%** |
| E (Test 5) | Confused respondents only: 91.8%<br>All respondents: 30.0% | Confused respondents only: 85.0%<br>All respondents: 11.3% | **Confused respondents only: -6.8%**<br>**All respondents: -18.7%** |

**Exhibit 4-3**[1]
**Results of the Re-Tabulation of the Open-Ended Responses**
**[Reported in Exhibit A-3, B-3, C-2, D-2, E-3]**

Ex. J at 2.[9]

Dr. Wind also submitted new versions of each of the Exhibits related to Figure 6.  For

example, Dr. Wind provided a new version of Exhibit C-2, shown below:

---

[9] An abridged version of Exhibit 4-3 is also included on page 14 of Dr. Wind's Rebuttal Report as Figure 4-3, omitting the net confused percentages among "all respondents" and the percentage point change between the original and "re-tabulated" Figure 6.  Rebuttal Report at 14; *see id.* n.17 ("The full re-tabulation of the data underlying these exhibits can be found attached to my report as Appendix 3d.").

**Rebuttal Report Exhibit C-2**

**Exhibit C-2:**
**Consumers confusion is mostly due to the Course Hero use of CMI indicators – Stimuli 3**

| Based on: | Test (n=150) | Test – Confused Q1-Q3 (n=26) |
|---|---|---|
| Course Hero Logo | 4.7% | 26.9% |
| Course Hero Banner Ads | 0.7% | 3.8% |
| Course Hero Advertisement | 3.3% | 19.2% |
| Course Hero Copyright Notice | 0% | 0% |
| Course Hero Other | 2.7% | 15.4% |
| **NET: Course Hero** | **10.0%** | **57.7%** |

Ex. G at 16.  This Rebuttal Report Exhibit C-2 varies from the Opening Report Exhibit C-2 in that all the reported percentages are different than previously reported.  *See supra*, Part II.A; Pittaoulis Decl. ¶ 35.

The change from the Opening Report to the Rebuttal Report is even more fundamental with respect to Exhibit E-3, which saw not only a change in the percentages reported, but also a change in three of the categories of CMI coded:

**Wind Opening Report**

**Exhibit E-3:**
**Prospective Consumer Confusion As To The Authorship and Ownership Of The Post University Document On The Course Hero Platform Is Partially Due To the Course Hero CMI On Or Near The Post University Documents - Stimuli 5**

| Based on: | Test (n=150) | Test – Confused Only (n=49) |
|---|---|---|
| Course Hero name on document | 19.3% | 53.1% |
| Course Hero watermark | 2.7% | 8.2% |
| Course Hero website / link | 11.3% | 34.7% |
| **NET: Course Hero** | **30.0%** | **91.8%** |

**Wind Rebuttal Report**

**Exhibit E-3:**
**Consumers confusion is mostly due to the Course Hero use of CMI indicators – Stimuli 5**

| Based on: | Test (n=150) | Test – Confused Q1-Q3 (n=20) |
|---|---|---|
| Course Hero Logo | 1.3% | 10.0% |
| Course Hero Advertisement | 0.7% | 5.0% |
| Course Hero Watermark | 8.0% | 60.0% |
| Course Hero Website / Link | 8.0% | 60.0% |
| Course Hero Other | 2.0% | 15.0% |
| **NET: Course Hero** | **11.3%** | **85.0%** |

Ex. B at 28; Ex. G at 27; *see* Pittaoulis Decl. ¶ 36.  As shown above, in his Opening Report,

Dr. Wind presented three coding categories:  "Course Hero name on document," "Course Hero

watermark," and "Course Hero website / link."  Ex. B at 28.  However, in his Rebuttal Report,

Dr. Wind presents the categories of "Course Hero Logo," "Course Hero Advertisement,"

"Course Hero Watermark," "Course Hero Website / Link," and "Course Hero Other."  Ex. G at

27.  Learneo has never received coding guidelines consistent with the coding categories in

Dr. Wind's Opening Report Exhibit E-3.

Dr. Wind also changed his Opening Report in a more subtle, but highly material, way.

Unlike his Opening Report Figure 6 Exhibits, which did not include the "Other" category as a

result showing confusion based on Course Hero CMI, Dr. Wind shifted the row to above the

"Net" line and now included it in the results he reported.  *See* Ex. G; Pittaoulis Decl. ¶ 30.  As

explained by Dr. Wind in the footnote attached to "Other" in Exhibit A-3 of his new Figure 6

Exhibits:

> **I updated this exhibit from the Opening Report to include the
> "Other" category toward the "net Course Hero"** because the
> "Other" category includes references to Course Hero CMI on the
> Course Hero webpage, although it does not cleanly fit into the
> categories above.

Ex. G at 5 n.1 (emphasis added).  Each of the Rebuttal Report Figure 6 Exhibits was updated in

this way.  *See* Ex. G; Pittaoulis Decl. ¶ 30.

This not only is a substantive change in the basis for Dr. Wind's opinions, but also

constitutes a deviation from Dr. Wind's previously reported methodology.[10]  Pittaoulis Decl.

---

[10] While Dr. Wind's Rebuttal Report Figure 6 includes a footnote in Appendix 3d that states, "These are net of 4 reasons – Course Hero logo – Course Hero banner ads, Course Hero advertisements and Course Hero copyright notice. The detailed breakdown is included in the supporting data Appendix 4(h)," this appears to have been mistakenly carried over from Dr. Wind's Opening Report Figure 6.  *Compare* Ex. I at 4 n.1 *with* Opening Report at 14 n.4.  The footnote not only references Opening Report Appendix 4(h), which Dr. Wind confirmed during his deposition did not include analysis to support Figure 6, *see* Wind Deposition at 199:3-21, but also runs contrary to

¶¶ 25-30.  As discussed above, Dr. Wind repeatedly confirmed there were **four** categories of alleged CMI that were coded for in his Opening Report.  *See supra* Part II.A; *see also* Wind Deposition at 38:9-13.  In his Opening Report CMI Methodology, there is no mention of an "Other" category.  *See supra* Part II.A; Ex. E.  At his deposition, Dr. Wind affirmed that there were only four categories that were used for coding.  Wind Deposition 167:19-168:2.  Changing the process used to analyze data, as Dr. Wind did by adding the "Other" category into his calculation of "net Course Hero," is a change in methodology.  Pittaoulis Decl. ¶¶ 25-30.

### 2.    Dr. Wind's New Analysis Relating to Rebuttal Report Figure 6 and the Associated Exhibits

Dr. Wind also made changes to the highlighted "verbatims" he used to support his opinions.  As discussed above, previously these Opening Report Verbatim PDFs only highlighted alleged "confused" responses, without any indication or identification of the claimed basis for the confusion.  *See supra*, Part II.A.  In Dr. Wind's Rebuttal Report, however, he updated verbatims to include red text, which Dr. Wind described as "indicat[ing] confusion on the basis of Course Hero CMI . . . [and] the basis for the CMI confusion" ("Red Text Rebuttal Report Verbatim PDFs").  Rebuttal Report ¶ 30 n.13; Ex. H.  An example of this red text is below:

---

Dr. Wind's other rebuttal materials and does not match his new Figure 6 calculations.  *See* Ex. G at 5 n.1; Pittaoulis Decl. ¶¶ 27, 30.

**Excerpt from Red Text Rebuttal Report Verbatim PDFs**

| 129 | Q1 | A format of the tool Course Hero. Like a home page with all the options to choose from |
| | Q1a | It was a home page for course hero |
| | Q2a | Course Hero |
| | Q2b | Because it clearly stated it was from course hero Logo |
| | Q2c | If there was anything else I would have stated it. I don't need to be asked repetitive questions to get a answer. |
| | Q3a | Course hero |
| | Q3b | Because I'm sure it's a licensed company with photo rights Copyright |
| | Q4a | Course hero |
| | Q4b | Because that's what it states |
| | Q5a | Social media platforms |
| | Q5b | Because it had the name of the social media platforms |
| | Q6a | The social media platform it was displayed on |
| | Q6b | Bc it clearly stayed that |
| | Q7 | That you have to upload it to access the content |

Ex. H at 4.  Similar red text is added to a total of 116 responses in the Red Text Rebuttal Report

Verbatim PDFs, for all of which there is no corresponding analysis in Dr. Wind's Opening

Report.  *Id.*; Pittaoulis Decl. ¶ 40.

Dr. Wind did not explain why this analysis was now being provided, although he did

claim that the results were "non-material."  Rebuttal Report ¶ 41 ("I conducted a re-tabulation of

the open-ended responses underlying the results of my initial study presented in my Opening

Report. This re-tabulation identified non-material adjustments to the classification of

respondents.").  Dr. Wind never suggested that the newly added "red text" in the Red Text

Rebuttal Report Verbatim PDFs was an analysis that his coders previously performed.

> **3.     The Impact of Dr. Wind's New CMI Methodology and Analysis**

The changes discussed above to Dr. Wind's Opening Report methodology and the newly

provided analysis in his Rebuttal Report have a significant impact that is unfairly prejudicial to

Learneo.

18

Dr. Wind's new methodology for coding responses as confused-based-on-CMI that now included an "Other" category inflates the number of responses that were allegedly confused based on CMI.  *See* Pittaoulis Decl. ¶ 41.  Below is a comparison of an excerpt of Dr. Wind's Rebuttal Report Figure 6 with a table showing how that Figure would appear if the new "Other" category were not included:

**Excerpt of Rebuttal Report Figure 6 (All Respondents)**

| Stimuli | % who gave CH CMI Identifier as reason for confusion among the total sample (n=150) |
|---------|---------------------------------------------------------------------------------------|
| A | 9.3% |
| B | 14.7% |
| C | 10.0% |
| D | 17.3% |
| E | 11.3% |

**Rebuttal Report Figure 6 With "Other" Category Removed (All Respondents)**

| Stimuli | % who gave CH CMI Identifier as reason for confusion among the total sample (n=150) |
|---------|---------------------------------------------------------------------------------------|
| A | 5.3% |
| B | 8.0% |
| C | 8.0% |
| D | 11.3% |
| E | 10.0% |

*See* Pittaoulis Decl. ¶ 46.

As can be seen, if Dr. Wind applied the same methodology that was purportedly applied in his Opening Report to his Rebuttal Report, the results would have been far less favorable for Post.  *See* Pittaoulis Decl. ¶¶ 45, 47.  For example, rather than the 14.7% that is reported in his Rebuttal Report as the percentage of survey respondents who viewed Stimuli B that were "confused" based on alleged Course Hero CMI, that number would drop to only 8.0% if "Other" were excluded as a category.  Pittaoulis Decl. ¶ 45.  That is, by changing his methodology, Dr. Wind inflates the confusion-based-on-CMI reported by an average of 4 percentage points—*a percent increase of approximately 47 percent.  Id.*

In addition, while not explicitly addressed in Dr. Wind's Rebuttal Report Figure 6, the average number of respondents who were allegedly confused based on CMI was 12.5%.

Pittaoulis Decl. ¶ 48.  However, if Dr. Wind were to exclude "Other" in his Rebuttal Report

Figure 6 (as applying his methodology from his Opening Report would require him to do), that

number would drop to only 8.5%.  Pittaoulis Decl. ¶ 48.  This is below the percentage that is

generally considered by experts to show "confusion" and is often considered by courts to be low

enough to show **no** confusion, at least in the context of trademark confusion.  Pittaoulis Decl.

¶ 49.  Dr. Wind's Exhibit 4-3 (and Figure 4-3, which derives from Exhibit 4-3) in his Rebuttal

Report would also be impacted by the removal of the "Other" category.  *See* Pittaoulis Decl.

¶¶ 50-51.

Dr. Wind's unexplained disclosures and changes to his data analysis to support his

conclusions relating to his new Rebuttal Report Figure 6 and his new Rebuttal Report Figure 6

Exhibits also had a significant impact.  Whereas his Rebuttal Report Figure 6 Exhibits are based

on the red text provided in Dr. Wind's new Red Text Rebuttal Report Verbatim PDFs, his

Opening Report Figure 6 Exhibits are not based on any corresponding analysis in Dr. Wind's

Opening Report **at all**.  *See* Pittaoulis ¶ 18; Ex. C.  It appears Dr. Wind (or Illume) has now

conducted an analysis that never previously existed.

### D.    Learneo's Objections to Dr. Wind's Rebuttal Report and Attempts to Avoid Motion Practice

Learneo objected to the inclusion of these new disclosures in Dr. Wind's Rebuttal Report.

Rezkalla Decl. Ex. L at 4-5.  Post responded unequivocally, "Post does not and cannot agree to

withdraw the paragraphs and appendices referenced in your email from Dr. Wind's report."  *Id.*

at 3-4.  The parties met and conferred in good faith on April 30, 2024, and again on May 10,

2024, and, in both instances, Post refused either to seek leave of court to supplement Dr. Wind's

disclosed opinions to include the New CMI Methodology and Analysis or to withdraw the New

CMI Methodology and Analysis from the Rebuttal Report.[11]  Rezkalla Decl. ¶¶ 5-6.  Instead, Post claimed that Dr. Wind was *required* to supplement his Opening Report under Rule 23(e), arguing that Dr. Wind's New CMI Methodology and Analysis were merely "re-tabulation[s]." Rezkalla Decl. Ex. L at 3-4.  Post offered Learneo the opportunity to take a second deposition of Dr. Wind and/or serve a supplemental expert report in response.  *Id.*

      Because Learneo is prejudiced by Post's failure to explain its previous omission and consistent earlier refusals to provide the requested information, Learneo declined Post's offer.

## III.   LEGAL STANDARD

      Rule 26 of the Federal Rules of Civil Procedure requires that a written expert report contain "a complete statement of all opinions the witness will express and the basis and reasons for them . . . ."  Fed. R. Civ. P. 26(a)(2)(B)(i).  "It should be assumed that at the time an expert issues his report, that report reflects his full knowledge and complete opinions on the issues for which his opinion has been sought."  *Innis Arden Golf Club v. Pitney Bowes, Inc.*, No. 3:06 CV 1352(JBA), 2009 WL 5873112, at *3 (D. Conn. Feb. 23, 2009) (internal quotations omitted).

      In like manner, applicable to all discovery obligations, Rule 26(e) requires parties to supplement their expert disclosures "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing . . . ."  Fed. R. Civ. P. 26(e)(1)(A).  This duty "does not arise when [the] plaintiff seeks to bolster its earlier submission, but rather, arises only if the expert *subsequently* learns of information that was previously unknown or unavailable, that renders information previously

---

[11] The parties agreed that, aside from the contested materials identified in this motion as Dr. Wind's New CMI Methodology and Analysis, Learneo would not seek to strike any of Dr. Wind's other Opening Report alterations, and that Learneo may serve a supplemental report from its survey expert, Melissa Pittaoulis, regarding those other materials.  Rezkalla Decl. ¶ 7.

provided in an initial report inaccurate or misleading or because it was incomplete . . . ." *Innis Arden*, 2009 WL 5873112, at *3 (internal quotations omitted) (emphasis in original); *see Buxton v. Lil' Drug Store Prods., Inc.*, No. 2:02CV178KS–MTP, 2007 WL 2254492, at *5 (S.D. Miss. Aug. 1, 2007) ("Courts have . . . made it clear that supplemental expert reports cannot be used to 'fix' problems in initial reports.") (citations omitted), *aff'd*, 294 Fed. Appx. 92 (5th Cir. 2008). "Therefore, [i]f an expert's report does not rely [on] any information that was previously unknown or unavailable to him, it is not an appropriate supplemental report under Rule 26." *Levinson v. Westport Nat. Bank*, No. 3:09-CV-1955 (VLB), 2013 WL 3280013, at *5 (D. Conn. June 27, 2013) (alterations in original) (internal quotations omitted). "To interpret Rule 26(e)'s supplementation provision more broadly, particularly by permitting supplementation whenever a party seeks to bolster its expert, 'would [wreak] havoc [on] docket control and amount to unlimited expert opinion preparation.'" *Coene v. 3M Co.*, 303 F.R.D. 32, 42 (W.D.N.Y. 2014) (quoting *Lewis v. FMC Corp.*, 786 F. Supp. 2d 690, 705 (S.D.N.Y. 2011) (alterations in original)). Because of this, courts in the Second Circuit have generally rebuked such "sandbagging." *Id.*; *On Track Innovations, Ltd. v. T-Mobile USA, Inc.*, No. 12-CV-2224 (AJN), 2015 WL 14072083, at *4 (S.D.N.Y. July 24, 2015) ("Rule 26(e) . . . does not give license to sandbag one's opponent[.]").

"If a party fails to provide information . . . as required by Rule 26(a) or (e), the party is not allowed to use that information . . . to supply evidence . . . at a trial, unless the failure was substantially justified or is harmless[.]" Fed. R. Civ. P. 37(c)(1). "Rule 37(c)(1)'s preclusionary sanction is automatic absent a determination of either substantial justification or harmlessness."

*Innis Arden*, 2009 WL 5873112, at *2 (quoting *Lore v. City of Syracuse*, No. 5:00–CV–1833, 2005 WL 3095506, at *3 (N.D.N.Y. Nov. 17, 2005)).

Second Circuit courts also consider the following factors in determining whether to strike expert testimony:  "(1) the party's explanation for the failure to comply with the discovery order; (2) the importance of the testimony of the precluded witness; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance."  *Softel Inc. v. Dragon Med. & Scientific Comm., Inc.*, 118 F.3d 955, 961 (2d Cir. 1997) (citing *Outley v. City of New York*, 837 F.2d 587, 590–91 (2d Cir. 1988)).  "None of these factors are dispositive and each factor is to be balanced against the others in making the determination."  *Lab Crafters, Inc. v. Flow Safe, Inc.*, No. CV–03–4025 (SJF)(ETB), 2007 WL 7034303, at *6 (E.D.N.Y. Oct. 26, 2007) (citing *Softel*, 118 F.3d at 961).

## IV.    ARGUMENT

The New CMI Methodology and Analysis in Dr. Wind's Rebuttal Report is untimely.  To the extent it is a valid analysis, it should have been disclosed in Dr. Wind's Opening Report by January 12, 2024, as required by the Court's scheduling order.  Because the New CMI Methodology and Analysis are not a permissible supplement under Rule 26(e), but rather an attempt to bolster previously unsupported methodology and analysis, this Court should strike them.

### A.    Dr. Wind's New CMI Methodology and Analysis Violates the Scheduling Order

#### 1.    Dr. Wind's New CMI Methodology and Analysis Is in Violation of Rule 26(a)(2)(B)(i)

Dr. Wind's inclusion of New CMI Methodology and Analysis relating to his Opening Report materials in his Rebuttal Report violates Rule 26(a)(2)(B)(i).  Rule 26(a) requires that a written expert report contain "a complete statement of all opinions the witness will express *and*

*the basis and reasons for them*."  Fed. R. Civ. P. 26(a)(2)(B)(i) (emphasis added).  As shown above in Part II, the New CMI Methodology and Analysis belatedly applies a new methodology and belatedly discloses an analysis for opinions that Dr. Wind gave in his Opening Report.  As a result, they were not timely disclosed and constitute a violation of the scheduling order.  *See* Dkt. No. 103.

Thus, unless some exception applies, Dr. Wind's New CMI Methodology and Analysis should be stricken.  *See Innis Arden*, 2009 WL 5873112, at *4 (granting motion to strike untimely supplemental report served in violation of Rule 26(a)).

### 2.    Dr. Wind's New CMI Methodology and Analysis Is Not a Permissible Supplement Under Rule 26(e)

Post claims that Dr. Wind's New CMI Methodology and Analysis is justified as a required "supplement" under Rule 26(e).  *See supra* Part II.E.  Because Dr. Wind's New CMI Methodology and Analysis is neither based on previously unknown or unavailable information nor based on an honest mistake or omission, it is not a proper "supplement" under Rule 26(e).

### a.    Dr. Wind's New CMI Methodology and Analysis Is Not Based on Previously Unknown or Unavailable Information

The New CMI Methodology and Analysis are *entirely* based on information that was available to Dr. Wind prior to submitting his Opening Report.  Dr. Wind's Rebuttal Report characterizes the New CMI Methodology and Analysis as a "re-tabulation" that "re-affirm[s]" the conclusions from his Opening Report.  Rebuttal Report ¶ 34.  But, neither Dr. Wind nor Post claim that Dr. Wind's New CMI Methodology and Analysis were based on information previously unknown or unavailable to Dr. Wind.  Indeed, Post's counsel has ***admitted*** that this New CMI Methodology and Analysis is "*based on the exact same underlying data presented with his opening report*."  Rezkalla Decl. Ex. L at 3-4 (emphasis added).

Rule 26(e) is not "a vehicle to permit a party to serve a deficient opening report and then

remedy the deficiency through the expedient of a 'supplemental' report." *Lidle v. Cirrus Design Corp.*, No. 8 Civ. 1253(BSJ)(HBP), 2009 WL 4907201, at *5 (S.D.N.Y. Dec. 18, 2009) (striking the alleged supplemental report). "An expert thus may not use Rule 26(e) supplementation as a guise for merely reiterating opinions from his or her initial report or adducing previously available information to strengthen those opinions." *Mobius v. Quest Diagnostics Clinical Lab'ys, Inc.*, No. 1:19-CV-00499, 2023 WL 5314557, at *4 (W.D.N.Y. Aug. 18, 2023).

The circumstances here are no different than in *Mobius*. *Id.* In that case, plaintiffs attempted to supplement their expert's opening report with information about the expert's qualifications, none of which was "previously unknown or unavailable to [the expert] such that his initial report was rendered inaccurate or misleading." *Id.* (internal quotations omitted). The Court concluded that because the "supplement" did not rely on information that the expert "subsequently learn[ed]," it was "thus not appropriate supplementation under Rule 26(e)." *Id.*

Just like the plaintiffs' expert in *Mobius*, Dr. Wind is not entitled to submit new materials to support his previously offered opinions for which no new information has been learned. The New CMI Methodology and Analysis that Dr. Wind injects into his Rebuttal Report relates to information that was readily available to Dr. Wind at the time his Opening Report was served. Just like the expert in *Mobius*, Dr. Wind could have made these disclosures in his Opening Report, but instead ***chose*** to submit his Opening Report based on a different methodology, without any analysis of data in support of his opinion.

He cannot now introduce a New CMI Methodology and Analysis to cure the opinions offered in his Opening Report. *See id.* This "sandbagging" is precisely the misuse of Rule 26(e) that courts in this Circuit have consistently rejected. *See On Track Innovations*, 2015 WL 14072083, at *4 (concluding preclusion of new report was appropriate "to prevent the practice of

'sandbagging'" where it was based on previously available information); *see also Anderson Grp., LLC v. City of Saratoga Springs*, No. 1:5-cv-1369 (GLS/DRH), 2010 WL 8357263, at *1 (N.D.N.Y. May 28, 2010) (striking portions of supplemental report that were not contained in the original report and not based on any new data that came into existence after the original report); *Gyllenhammer v. Am. Nat'l Red Cross*, No. 3:15-CV-1143 (BKS)DEP, 2018 WL 1956426, at *5 (N.D.N.Y. Jan. 23, 2018) (finding supplement improper where "Plaintiff has provided no explanation for the delay" and "[t]here were no facts unavailable to [the expert] at the time of his first report and deposition that prevented him from forming and disclosing these opinions months earlier"); *In re Thilman*, 557 B.R. 294, 303 (Bankr. E.D.N.Y. 2016) (finding where second report was "not based on new evidence or new information . . . [it] would supplant, rather than supplement" which is "not the purpose of Rule 26(e)(1)").

> **b.** **Dr. Wind's New CMI Methodology and Analysis Is an Illicit Attempt to Bolster His Opening Report Opinions**

Dr. Wind's and Post's conduct appears motivated by an intent to bolster his Opening Report opinions. Despite affirming the accuracy and completeness of his Opening Report, Dr. Wind was unable to resolve the absence of crucial supporting analysis needed to make sense of the Opening Report Figure 6 results and his opinions relying on that Figure during his deposition. Wind Deposition at 14:3-11; 170:25-174:12. It is no surprise that after his deposition, Dr. Wind attempts to supplement the opinions he previously offered with New CMI Methodology and Analysis.

To be clear, there is ***no*** parallel methodology or analysis that existed in Dr. Wind's Opening Report for the newly created New CMI Methodology and Analysis. Pittaoulis Decl. ¶¶ 26, 38, 40. As to methodology, Dr. Wind has changed his process for determining how to categorize whether respondents were allegedly confused based on CMI. Originally, Dr. Wind

only identified four categories of alleged Course Hero CMI in his Opening Report.  Now, Dr. Wind considers a *new* fifth category ("Other").  Ex. G at 5 n.1.  As to analysis, the red text analysis in the Red Text Rebuttal Report Verbatim PDFs (and relied upon in the other contested materials) is absent from Dr. Wind's Opening Report and materials completely, appearing for the first time with his Rebuttal Report.  *Compare* Ex. C *with* Ex. H.

Dr. Wind's New CMI Methodology and Analysis exist to bolster Dr. Wind's Opening Report opinion that "[t]he Course Hero CMI identifiers are therefore the main reason for the confusion as to the author and or owner of the Post University material on, or downloaded from, the Course Hero website."  Opening Report ¶ 30 (citing Figure 6).  Had Dr. Wind, for instance, used the methodology that was allegedly used for his Opening Report to categorize the alleged confusion reflected in Figure 6, it is unlikely he could have made the assertion that his opinions were not changed.  Pittaoulis Decl. ¶ 43 (noting that 31.9% of respondents that Dr. Wind includes in his Figure 6 calculations *only* received the new "Other" CMI coding).  That is to say, had Dr. Wind omitted the category of "Other," his reported level of alleged "confusion based on CMI" would have been significantly lower.  *Id.* at ¶ 51.  Moreover, Dr. Wind's Rebuttal Report Figure 6 results and opinion directly rely on the red text added to the verbatims, without which his Opening Report opinion would have ***nothing*** as supporting analysis.

Courts in this Circuit have readily rejected such improper bolstering under the guise of "supplementing" opening reports.  *See Wechsler v. Hunt Health Sys., Ltd.*, 381 F. Supp. 2d 135, 157 (S.D.N.Y. 2003) (finding "new analysis [] based on no new information" is not a proper supplement under Rule 26(e)); *Innis Arden*, 2009 WL 5873112, at *3 (finding supplement was improper bolstering under Rule 26(e), where a new expert report was "generated after [p]laintiff recognized the need for and benefit of greater detail in the [initial expert report]" (internal

quotations omitted) (alterations in original)); *Coene*, 303 F.R.D. at 42 (finding supplement was improper bolstering under Rule 26(e), where a new expert report was offered following deposition, "[i]n light of questioning by defense counsel" (alterations in original)).  And since the contents of Dr. Wind's New CMI Methodology and Analysis directly rely on Dr. Wind's new methodology considering "Other" CMI and the new analysis inherent in the verbatims' red text, all of the New CMI Methodology and Analysis are improper supplements under Rule 26(e).  *Id.*

To be clear, if Dr. Wind wanted to support his Figure 6 opinion by including red text coding for CMI or accounting for an "Other" category of CMI, he should have, *and could have*, done so at the time of his Opening Report.  His choice not to do so is not a license to create new materials to bolster his opinions months later, "[t]o rule otherwise would create a system where preliminary reports could be followed by supplementary reports and there would be no finality to expert reports[.]"  *See On Track Innovations*, 2015 WL 14072083, at *4 (internal quotations omitted); *Wechsler*, 381 F. Supp. 2d at 157 (S.D.N.Y. 2003).

### c. Dr. Wind's New CMI Methodology and Analysis Cannot Be Analogized to Cases Where Supplementation Was Permitted

Post claims that Dr. Wind's New CMI Methodology and Analysis is a required "supplementation" under Rule 26(a), and during the meet-and-confer process, pointed to three cases to support its position.  Rezkalla Decl. Ex. L at 1-2.  None support Post.

The first, *Associated Electric Gas Insurance Services v. Babcock & Wilcox Power Generation Grp., Inc.* ("*Babcock*"), determined that a supplemental report served to address "mistaken calculations" did not run afoul of Rule 26(a).  No. 3:11CV715 (JCH), 2013 WL 4456640, at *4 (D. Conn. Aug. 16, 2013).  The expert in *Babcock* had learned after filing his opening report that his report's analysis and opinions relied on mathematical errors that were the product of another person's "honest mistake."  *Id.*  Similarly, *Sitts v. Dairy Farmers of America,*

*Inc.*, involved an expert who learned that his opening report opinion relied on a software processing error, and thereafter supplemented his report to correct it, applying the same methodology from his opening report.  No. 2:16-CV-00287, 2020 WL 3467993, at *3 (D. Vt. June 24, 2020).  Notably, the *Sitts* court recognized that a "computer code problem is akin to a "mistake[ ] in arithmetic [that] can be corrected (*unlike the mistake of using an unreliable methodology*)[.]"  *Id.* at *9.  Finally, *In re CIL Ltd.* involved an expert who, similar to the experts in *Babcock* and *Sitts*, corrected an error that affected his calculations.  No. 13-11272-JLG, 2019 WL 1750909, at *21 (Bankr. S.D.N.Y. Apr. 8, 2019).  In finding that the expert's supplement correcting the error was proper, the court emphasized, among other things, that "[the expert] did not alter his valuation methodologies" and that the expert had given fair notice during his deposition that he suspected there may have been an error in his compilations and that his investigation "was ongoing."  *Id.* at *20-*21.

This case does not present analogous facts.  Unlike in any of the three cases above, Dr. Wind never claimed to have learned previously unknown information necessitating his alleged supplement.  *See supra* Part II.C.  Nor could he.  Learneo informed Post of the missing methodology and analysis ***months*** earlier, but was constantly assured by Post that Dr. Wind had made a full disclosure.  *See id.*  In addition, unlike in *Babcock*, *Sitts*, and *In re CIL Ltd.*, Dr. Wind does not claim to be addressing simple mistakes in his calculations or arithmetic errors.  *See supra* Part II.D.  He provides no reason for his "supplement" at all.  *Id.*  The outcome of the "supplement" is clear, however:  the New CMI Methodology and Analysis inflate his results and bolsters an opinion that was otherwise unsupported.

This case is more analogous to *Wechsler v. Hunt Health Systems, Ltd.*, 381 F. Supp. 2d 135 (S.D.N.Y. 2003).  In *Wechsler*, the court struck the contents of a supplemental report that

(1) "d[id] not arise from any after acquired information" and (2) offered "new analysis . . . to bolster [the] original expert report." *Id.* at 157.  Importantly, while the *Wechsler* court permitted the expert to supplement his opening report to, for instance, add documents to his "documents reviewed" and otherwise "correct [] oversight[s] in the original report," the court refused to allow any change to the expert's analysis that "replace[]" rather than "supplement" the original report. *Id.* at 155-57.  Dr. Wind's New CMI Methodology and Analysis falls plainly in the latter camp. *See id.*  Here, Dr. Wind is replacing both his previous methodology and his absent analysis.  Post's arguments that Dr. Wind's New CMI Methodology and Analysis is a permissible supplementation should be rejected.

### B.      The New CMI Methodology and Analysis Should Be Stricken

Post's attempt to subvert this Court's scheduling order and inject the New CMI Methodology and Analysis in an attempt to bolster Dr. Wind's Opening Report opinions is not substantially justified and is unfairly prejudicial to Learneo.  When considered as a whole, the *Softel* factors weigh in favor of preclusion. *Softel*, 118 F.3d at 961.  As such, the Court should strike the New CMI Methodology and Analysis from Dr. Wind's rebuttal materials.

### 1.      The New CMI Methodology and Analysis Is Not Substantially Justified

Post cannot justify its failure to comply with the Court's scheduling order.  Learneo made Post aware of the deficiencies in Dr. Wind's Opening Report almost immediately after it was served, but Post delayed over three months before providing Dr. Wind's New CMI Methodology and Analysis.  Even if Dr. Wind had not substantially delayed, there is no justification for creating new materials to bolster old conclusions.  "Such a self-serving supplementation is not 'substantially justified' under Rule 37(c)(1)." *See Innis Arden*, 2009 WL 5873112, at *3; *supra* Part IV.A.  Because Post cannot offer a "substantial justification" for its delayed disclosure,

Dr. Wind's New CMI Methodology and Analysis should be "automatic[ally]" precluded.  *See Innis Arden*, 2009 WL 5873112at *2 (citing Fed. R. Civ. P. 37(c)(1)).

### 2.   Consideration of All the *Softel* Factors Weighs in Favor of Preclusion

In considering striking of an expert report, courts often consider the *Softel* factors.  When considered as a whole, they weigh in favor of preclusion.  *See Softel*, 118 F.3d at 961.

As to the third factor, Learneo has been demonstrably prejudiced by Post's conduct. Contrary to Post's assertions that "Dr. Wind is not presenting new conclusions, data or studies," Rezkalla Decl. Ex. L at 4, the New CMI Methodology and Analysis alter Dr. Wind's former analysis, forcing Learneo to expend significant time, money, and efforts reconsidering and addressing Dr. Wind's opinions—including in connection with this motion.  Permitting Post to amend Dr. Wind's Opening Report in this way, without seeking leave of Court or demonstrating good cause, would be rewarding Post for violating Rule 26(a)'s obligation to provide a "complete statement" of opinions, ***and their bases***, at the time required by this Court's scheduling order.  *See* Fed. R. Civ. P. 26(a)(2)(B)(i).

Post's untimely submission also denies Learneo the ability to depose Dr. Wind on these new materials and Learneo's rebuttal expert the opportunity to consider these materials to inform her rebuttal report.  While Post has offered Learneo more time to depose Dr. Wind and Learneo's expert the option to submit a supplemental report, Learneo remains prejudiced due to the time, money, and effort that has ***already*** gone into analyzing Dr. Wind's Opening report and formulating Learneo's response.  Post's offered cure for prejudice is no cure at all.  It imposes ***more*** costs and delays resolution of this case even further.  *See Wechsler*, 381 F. Supp. 2d at 158 (striking portions of supplemental report making alterations to expert's original report because they prejudice defendants); *Hernandez v. Money Source Inc.*, No. 17-CV-6919 (GRB)(AYS), 2022 WL 2702894, at *7 (E.D.N.Y. July 12, 2022) (striking supplemental report where report

"proved far more than simply a recalculation," but rather "a change in methodology").

The first factor also weighs in favor of preclusion. Post and Dr. Wind offer no reason why the New CMI Methodology and Analysis was not provided sooner. Indeed, Dr. Wind never explains why he engaged in the New CMI Methodology and Analysis ***at all***. *See supra* Part II.C.

On the fourth factor, while no trial date has been set, a continuance here would be a burden on both Learneo and the Court. Since this litigation initiated more than two years ago, discovery deadlines have been extended seven times. Dkt. Nos. 102, 125, 126. Almost all of those extensions have been initiated by Post. The Court already made clear more than six months ago that "request[s] for a further extension to the close of discovery deadline is disfavored." Dkt. No. 103. Because an eighth continuance for Post's benefit would be "disfavored," the fourth *Softel* factor weighs in favor of Learneo.

Finally, as to the second factor, Learneo does not dispute that the New CMI Methodology and Analysis is important, as in its absence, opinions expressed in Dr. Wind's Opening Report lack a reliable basis. However, if this were sufficient to overcome the remaining factors—which all weigh in favor of exclusion—no expert would ever be excluded based on flawed methodology, because they would be forever entitled to "supplement" it.

On balance, the *Softel* factors weigh in favor of preclusion.

## V.    CONCLUSION

Dr. Wind's Rebuttal Report contains an improper disclosure of a new methodology and new analysis that runs contrary to this Court's scheduling order and the Federal Rules. This alleged "re-tabulation," which is anything but, prejudices Learneo and can only be cured by striking the contested portions of Dr. Wind's report and materials. As such, this Court should grant Learneo's motion and strike the red text provided in Dr. Wind's Rebuttal Report Appendix 3a and all tables, figures, analysis, and opinions stemming therefrom, including the

Figure 6 Exhibits, i.e., Exhibits A-3, B-3, C-2, D-2, and E-3 (and footnote 1) in Appendix 3b,

Figure 6 in Appendix 3c, Figure 4-3 in Dr. Wind's Rebuttal Report, and Exhibit 4-3 in

Appendix 3d, and any references thereto.

Dated: May 22, 2024                    DEFENDANT LEARNEO, INC.


                                       By:   */s/ Allyson R. Bennett*
                                       _____

                                            Allyson R. Bennett (*pro hac vice*)
                                            abennett@mofo.com
                                            MORRISON & FORESTER LLP
                                            707 Wilshire Boulevard
                                            Los Angeles, CA  90017-3543
                                            Telephone:      213.892.5200
                                            Facsimile:      213.892.5454

                                            Joseph C. Gratz (*pro hac vice*)
                                            jgratz@mofo.com
                                            Vera Ranieri (*pro hac vice*)
                                            vranieri@mofo.com
                                            Annie A. Lee (*pro hac vice*)
                                            annielee@mofo.com
                                            Ian Bennett (*pro hac vice*)
                                            ibennett@mofo.com
                                            Justin K. Rezkalla (*pro hac vice*)
                                            jrezkalla@mofo.com
                                            MORRISON & FORESTER LLP
                                            425 Market Street
                                            San Francisco, CA  94105-2482
                                            Telephone:      415.268.7000
                                            Facsimile:      415.268.7522

                                            Patrick M. Fahey (ct13862)
                                            SHIPMAN & GOODWIN LLP
                                            One Constitution Plaza
                                            Hartford, CT  06103-1919
                                            Telephone:      860.251.5824
                                            Facsimile:      860.251.5219
                                            Email:    pfahey@goodwin.com

                                            Attorneys for Defendant