# EXHIBIT A

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

THE SCOTTS COMPANY LLC, et al.,

          **Plaintiffs,**                  **Case No. 2:24-cv-4199**

      **v.**                            **JUDGE DOUGLAS R. COLE**

THE PROCTER & GAMBLE COMPANY,

          **Defendant.**

## OPINION AND ORDER

This is a trade dress infringement action. Plaintiffs The Scotts Company LLC,

and OMS Investments, Inc. (collectively Scotts) own the rights to the Miracle-Gro line

of plant food and lawn and garden products. They look like this:





   

(Am. Compl., Doc 60, #3900; JX-2146–2155). Defendant The Proctor & Gamble Company (P&G) recently introduced a new non-selective herbicide called "Spruce," with the following packaging design:

    

(Doc 60, #3904; JX-2161–2165).[1] In laymen's terms, Spruce is a weed killer. Presently, Scotts is seeking a preliminary injunction to prevent P&G from distributing, selling, or advertising Spruce during the pendency of this action. As further explained below, to obtain that "extraordinary remedy," Scotts must show, inter alia, that consumers who have long been exposed to the Miracle-Gro family of products, and who then come

---

[1] Spruce comes in many configurations, most of which are pictured above. From left to right are: the 24-ounce spray bottle; the 10-ounce EZ AIM bottle; the 64-ounce bottle with an automated power wand sprayer; the 64-ounce refill bottle; and the 64-ounce bottle with manual sprayer. (Doc. 30-1, #753–54). There is also a value pack which include two EZ AIM bottles. (*Id.* at #753).

across the Spruce products against the backdrop of other commercially available lawn-care products, would be likely to (wrongly) conclude the Spruce products are part of, or somehow associated with, the Miracle-Gro family. On the record here, Scotts has failed to make that showing. Accordingly, the Court **DENIES** its Motion for Preliminary Injunction (Doc. 2).

## BACKGROUND

### A.    Factual Background

#### 1.    Scotts and the Scotts' Miracle-Gro Trade Dress.

First, a bit about the parties and products at issue. The Scotts Company LLC is an Ohio limited liability company with its principal place of business in Marysville, Ohio. (Doc. 60, #3898). It was founded in 1868 and is the market leader in the lawn and garden business. (Tr. of Prelim. Inj. Hr'g, Doc. 68, #5559–60, 5592–93). OMS Investments, Inc., is a Delaware corporation with an office in Los Angeles, California. (Doc. 60, #3899). It owns the Miracle-Gro trade dress. (*Id.* at #3988, 3902; Doc. 60-2, #3925). OMS licenses that trade dress to The Scotts Company. (Doc. 60, #3898).

So what exactly *is* the Miracle-Gro trade dress? To start, Scotts owns and uses U.S. Trademark Registration No. 2,139,929, which "consists of a rectangular shaped box in the colors green and yellow" for "plant food." (Doc. 60-1, #3922 (capitalization omitted); JX-2056; *see also* Doc. 60, #3901). The U.S. Patent and Trademark Office (USPTO) issued that Registration on March 3, 1998. (Doc. 60-1, #3922). The image

on the Registration is black and white,[2] but when the appropriate colors are transposed onto that image, the mark looks something like this:



(Doc. 30, #714).

To be clear, though, Scotts is asserting a trade dress in this case that goes beyond that Registration. (*See* Doc. 60, #3902 (claiming OMS "owns the common law trademark rights in the [Miracle-Gro] trade dress")).[3] Specifically, Scotts states that its Miracle-Gro trade dress comprises five elements:

(1) A green and yellow color combination;

(2) With each color presented as a separate horizontal band and the top color taking up a smaller ratio than the bottom color;

(3) With the two bands sharing a common border that runs horizontally along the package;

(4) With a straight line dividing the two colored bands; and

(5) A circular horizontally centered graphic element.

---

[2] In 1995, the USPTO used "conventional linings" to depict colors because it only accepted black and white images. (Doc. 30, #713 n.3 (quotation omitted); Doc. 30-12, #863–64 (attaching 37 C.F.R. § 2.52 (1994))). P&G has helpfully transposed the appropriate colors onto the image included in the Registration.

[3] Scotts tries to lump its Registered mark and common law trade dress into a single concept. (Doc. 60, #3902). That muddling of the two confuses the analysis and is improper, as explained below.

(Doc. 2-1, #504; Doc. 60, #3899–900). The Court refers to this combination of elements as Scotts' Common Law Trade Dress (or Trade Dress), and the more narrow "rectangular shaped box" combination as the Registration, to avoid confusion.

As the above description suggests, Scotts' Common Law Trade Dress is broader than its Registration in two noticeable ways. First, the Trade Dress does not have a shape restriction (i.e., "a rectangular shaped box"). Second, the Trade Dress seems to apply to products beyond the narrow plant-food category. (*See e.g.*, Doc. 60, #3900 (displaying potting mix and garden soil)). Notably, though, Scotts has never used the Miracle-Gro Trade Dress with any herbicide (i.e., weed killer), nor does it plan to.[4] (Doc. 68, #5682–83). Also, while broader in some respects, the Trade Dress as Scotts describes it has greater specificity in other respects—for example, it incorporates the "circular horizontally centered graphic element." (Doc. 60, #3900). For all intents and purposes, this "horizontally centered graphic element," at least as implemented on the products that Scotts sells, is the Miracle-Gro logo or wordmark, which consists of white text overlaid on (and extending beyond the horizontal border of) a black circle with some additional graphic sheen. (*See* Doc. 68, #5594).

Scotts has sold products incorporating its Common Law Trade Dress for decades; it ranges from 15 to 70 years depending on the specific product. (*See id.* at #5561–72). The Miracle-Gro Water Soluble All Purpose Plant Food (pictured below)

---

[4] Instead, Scotts has the licensing rights to sell and market Roundup (the "top-selling weed killer in the United States") and owns the brand Ortho (another "top-selling weed killer[]") as well. (Doc. 68, #5671, 5683).

is the original formulation and is most closely associated with the Registration. (*Id.* at #5565–66). Scotts has sold it for over 70 years. (*Id.*).



(JX-2018.259[5]). Since 2014, Scotts has sold around 104 million units of this product for approximately $650 million. (Doc. 68, #5596–97). Across the entire line of products bearing the Common Law Trade Dress, Scotts has sold, during that same time, roughly one billion units, generating approximately $5.6 billion in revenue.[6] (*Id.* at #5595–96). However, Scotts' Miracle-Gro products do not stop with the products exhibiting the Trade Dress. Just under one-third of Miracle-Gro products (at least from a revenue perspective) are so-called "specialty products" or "flavors," (*see id.* at #5616–17, 5680), which come in quite different packaging (although sometimes with at least some of the design elements from the Trade Dress), and which "are designed

---

[5] This image comes from a zoomed-in portion of a high-definition photo used in Dr. Wind's survey (more on Dr. Wind and his survey below). JX-2018.273 below is also a zoomed-in portion of another such photo.

[6] The $10 billion number Scotts cited in its motion was, admittedly, overstated. (*Compare* Doc. 2-1, #501, *with* Doc. 68, #5681).

6

and marketed for specific, specialty plants, applications, or purposes," (Doc. 61-1, #4458). Some examples include:



(Doc. 30, #719; Doc. 61-1, #4456).

But now back to the Trade Dress products. As noted, Scotts sells a lot of them. Those sales primarily occur at brick-and-mortar stores (90% of sales).[7] (Doc. 68, #5593). Those stores include "do-it-yourself … home centers" like "Lowe's, Home Depot, Menards," but also large chain retailers like Target, Walmart, and Meijer, as

---

[7] The other 10% comprise online sales. (Doc. 68, #5593).

well as hardware, garden, and club stores. (*Id.* at #5584). And to buy a Miracle-Gro product consumers pay somewhere from $6 to $20 depending on the product and configuration. (*Id.* at #5593).

### 2.    P&G and its new Spruce Weed Killer.

Turn now to the other side of the "v." Defendant P&G is an Ohio corporation headquartered in Cincinnati, Ohio. (Doc. 60, #3897, 3899; Doc. 38, #1448). It was founded in 1837 and has evolved into a multinational consumer goods giant that has developed and maintained many well knowns consumer brands such as Tide, Crest, and Gilette. (Doc. 30-1, #748). But those mainstays are not at issue here. Rather, this case involves one of P&G's newest products—Spruce, a non-selective herbicide that P&G has developed to quickly and effectively kill weeds. (*Id.* at #753).

P&G began developing Spruce in 2022 when it saw an opportunity for innovation in the weed-killer market. (*Id.* at #750). Specifically, P&G Ventures—P&G's "entrepreneurial arm"—believed there would be consumer demand for a safe, but efficacious non-selective herbicide.[8] (*Id.* at #749–51). As a P&G witness explained, market research at the time suggested that consumers believed that there were safe herbicides, and that there were effective herbicides, but that few or no products exhibited *both* characteristics.

---

[8] "Nonselective herbicides generally contain ingredients that kill a wide variety of plant life that comes into contact with the herbicide, including weeds, grass, flowers, vegetation, or other plants. Selective herbicides, on the other hand, are designed to kill only certain types of vegetation, such as dandelions, crab grass, or other undesirable weeds, while leaving grass, flowers, and other desirable plants unharmed." (Doc. 30-1, #751).

After a few years of product and packaging development, P&G started shipping Spruce on November 1, 2024, and it became available to consumers mid-November 2024. (Tr. of Prelim. Inj. Hr'g, Doc. 69, #5875). Spruce is now in tens of thousands of stores and sells from $12.99 to $39.99 depending on the configuration. (*Id.* at # 5873, 5919). Much like Miracle-Gro, Spruce is carried in brick-and-mortar retailers such as Home Depot, Lowe's, Walmart, Target, Ace, and True Value. (*Id.* at #5875). It is also available online on Amazon and other websites. (*Id.*). P&G has invested significantly in television, online/social media, print, and in-store advertising as part of the product rollout. (*Id.* at #5875–86).

Spruce's packaging, while varying depending on the configuration, largely has the same visual elements across the product line:



(JX-2018.273). As depicted, the bottom of each container consists of a clear or transparent section. The transparent portion is designed to allow consumers to see

9

the liquid product. (*See id.*). Moving up the bottle, there is a dark green portion (a shade many would call, perhaps not coincidentally, "spruce green") that predominates most of the product packaging. (*See id.*). As is also evident above, the green is noticeably different from the green on the Miracle-Gro packaging. The Miracle-Gro green is a brighter green with a glossy finish that resembles a freshly cut lawn on a sunny day, while the green on the Spruce packaging has a matte finish and is darker, more like a pine (or spruce) tree in a shadowy forest.

On most of the Spruce configurations, a round, yellow dandelion image (with an even darker green background) traverses the clear and dark green portions.[9] (*See id.*). The image is intended to depict a half-living, half-dehydrated-and-dying, dandelion. (Doc. 30-1, #755). There are some smaller symbols and text descriptions in white and yellow surrounding the dandelion image. Moving further up the bottle, a consumer's eyes would meet the Spruce trademark in bold white text. (*See* Doc. 60, #3904). And above that is a yellow "violator"[10] containing the text "Visible Results in **1 HOUR**." (*See id.*).

There are variations depending on the configuration,[11] but those are the essential features of the Spruce packaging. The unique shapes of the Spruce containers are also worth noting—both the 64-ounce bottles and the EZ AIM bottles

---

[9] On the EZ AIM bottle, the dandelion image is fully within the dark green portion.

[10] A graphic violator is a visual element used in product design that sellers use to draw the consumer's attention to certain messaging the seller wants to emphasize.

[11] For example, the 64-ounce bottles have a second yellow violator and a white button with the Spruce trademark on the top portion of the bottle. (Doc. 30-1, #754).

were designed specifically for Spruce and to stand out in the market.[12] (Doc. 30-1, #756).

### 3.     Third Parties in the Lawn and Garden Products Sector.

Besides Scotts and P&G, there are some additional parties to discuss—sort of. P&G points out that various third-party lawn and garden products may have an impact on Scotts' arguments. Mainly, P&G notes that many third-party lawncare products similarly use green and yellow color combinations. (Doc. 30, #701, 721–23). For example:



(*Id.* at #701; DX-1003, 1010–12, 1018–19). While the exact extent of these third-party products' presence was not established, Scotts admitted that Preen Weed Preventer Plus Plant Food product (the leftmost picture above) is "widely sold in the lawn-and-garden marketplace" (perhaps outselling the Miracle-Gro weed preventer product) and at times "shelved right next to" that Miracle-Gro product. (Doc. 68, #5655, 5657, 5661). That is true also of Spectracide (the product in the center of the above array), which Scotts admitted is "a leading weed killer product." (*Id.* at #5666–67).

---

[12] That is, only the 24-ounce manual sprayer resembles other product containers. (*See* Doc. 30-1, #753, 756).

**B.    Procedural Background**

As noted, Scotts alleges that P&G entered the consumer lawn and garden market with a package design for Spruce that is confusingly similar to Scotts' Miracle-Gro Trade Dress. Scotts initiated this action on November 25, 2024, (Compl., Doc. 1), and moved for a preliminary injunction the same day, (Doc. 2). Specifically, Scotts alleges that P&G's "conduct constitutes unfair competition and infringement and dilution of Scotts' intellectual property rights." (Doc. 1, #2; *see also* Doc. 60, #3898). Scotts later amended its Complaint to include a false-advertising claim as well.[13] (Doc. 60, #3898, 3916). In sum, Scotts asserts six claims against P&G: (1) trademark infringement under 15 U.S.C. § 1114(1); (2) false designation of origin and unfair competition under 15 U.S.C § 1125(a); (3) trade dress dilution by blurring and tarnishment under 15 U.S.C. § 1125(c); (4) violation of Ohio's Deceptive Trade Practices Act; (5) common law unfair competition; and (6) false advertising under 15 U.S.C. § 1125(a). (Doc. 60, #3913–16). The four federal claims all arise under the Lanham Act. In terms of remedies, Scotts seeks declaratory and injunctive relief; an order under 15 U.S.C. § 1118 requiring P&G to destroy all violative products and materials; recalls of product packaging, advertisements, and promotions; notifications to customers, retailers, distributors, and vendors of the judgment; direct and indirect damages in the form of profits; and attorneys' fees and costs. (*Id.* at #3916–19).

---

[13] The false advertising claim is not at issue for purposes of the preliminary injunction motion before the Court. (*See* Doc. 59, #3895).

P&G, for its part, answered the original Complaint on January 31, 2025. (Doc. 38). It also asserted two counterclaims seeking (1) cancellation under 15 U.S.C. § 1604 of Scotts' Registration, and (2) a declaratory judgment that Scotts' alleged Trade Dress is neither protectable nor enforceable. (*Id.* at #1471–73).

But, a few days before answering the Complaint, on January 17, 2025, P&G also responded to Scotts' motion. (Doc. 30). In that response, P&G included several accompanying declarations—including, as particularly relevant here, a declaration from Maris Croswell, Senior Director of P&G Ventures (which is responsible for Spruce's development) and one from Dr. Itamar Simonson, a consumer survey expert who conducted a likelihood of confusion study for P&G. (Croswell Decl., Doc. 30-1; Simonson Decl., Doc. 30-20).

Shortly thereafter, a dispute arose between the parties over some expedited discovery Scotts sought in support of its Reply (mainly to respond to Croswell's and Simonson's claims). (Doc. 41). The Court granted some limited discovery, (1/31/25 Min. Entry[14]), including depositions of Croswell and Simonson, (Croswell Dep., Doc. 61-2; Simonson Dep., Doc. 61-6).

---

[14] At the Telephone Status Conference the Court set to discuss the issues with the parties, the Court set deadlines and hearing dates as well. The Court ordered P&G to complete document production by February 28, 2025, for the parties to complete depositions by March 14, 2025, and for Scotts to file its Reply by March 28, 2025. (1/31/25 Min. Entry). The Court also set a two-day hearing on Scotts' Motion for Preliminary Injunction for April 28 and 29, 2025. (*Id.*).

13

Following those depositions, Scotts replied in support of its request for a preliminary injunction on March 28, 2025.[15] (Doc. 61). The reply included a responsive declaration from John Sass, Scotts' Senior Vice President, Chief Creative Officer, and General Manager,[16] as well as a report from consumer survey expert Dr. Yoram (Jerry) Wind, who conducted his own likelihood of confusion study, as well as a trade dress dilution study. (Sass Decl., Doc. 61-1; Wind Expert Report, Doc. 61-16). The Court permitted P&G to file a sur-reply addressing Scotts' consumer surveys— surveys Scotts had completed after filing its motion for preliminary injunction and first disclosed in its reply. (Order, Doc. 63, #4886). P&G filed that sur-reply April 24, 2025. (Doc. 65).

## C.    Preliminary Injunction Hearing

The Court held a two-day Preliminary Injunction Hearing on April 28 and 29, 2025. (4/28/25 & 4/29/25 Min. Entries). On the first day, John Sass and Dr. Wind testified for Scotts. (4/28/25 Min. Entry; Doc. 68). On the second, Dr. Simonson and Maris Croswell took the stand for P&G. (4/29/25 Min. Entry; Doc. 69). The Court

---

[15] While Docket Entry 61 is dated April 14, 2025, it is a publicly filed and corrected version of the original filing, which was filed under seal. (Doc. 46). Docket Entry 61 and some other entries on the Court's docket were filed with redactions that the Court permitted after reviewing the parties' respective motions to seal. (*E.g.*, Doc. 45). In this Opinion and Order, the Court cites to the redacted versions that are publicly available where applicable.

[16] Sass's original declaration was filed with Scotts' motion for preliminary injunction. (Doc. 2-2). It also appears Sass was promoted between the time he gave his first deposition and when he appeared at the Preliminary Injunction Hearing. (*See* Doc. 74, #6321–22).

briefly recounts the highlights of those testimonies as relevant to the current motion, and the Court does so topically rather than sequentially.[17]

### 1.    Fact Witnesses: Sass and Croswell

No one at Scotts has "more institutional knowledge of the Miracle-Gro trade dress" than Sass, who has worked at Scotts for over 20 years. (Doc. 68, #5550, 5556). He's responsible for Scotts' advertising campaigns, in-store materials, brand teams, selecting agencies that assist with packaging, advertising, and media, and working with major retailers' marketing departments. (*Id.* at #5553–55). Sass's testimony largely concerned the history and longstanding success of the Miracle-Gro product line—namely its status as market leader in the lawn and garden categories. (*See, e.g.*, *id.* at #5556–60). He explained Scotts' general structure, which consists of three business units: (1) lawns (fertilizers, grass seeds, devices to spread product); (2) gardens (plant food, potting mixes, soils); and (3) controls (pesticides, weed killers). (*Id.* at #5553). He also gave insights into how long various Miracle-Gro products have been on the market. (*Id.* at #5561–72).

Sass also testified concerning the USPTO registration process for the Registration. As part of that process, Scotts submitted 12 distributor declarations and 110 consumer declarations. (JX-2057.061–.304). In each of those, the declarant said

---

[17] The Court closed the courtroom during limited portions of the Preliminary Injunction Hearing when Sass and Croswell testified about topics concerning trade-secret market research, confidential financial or product development information, and the like. (*See generally* Doc. 70). For obvious reasons, the Court does not disclose in this Opinion and Order the details of the information discussed during those portions of the hearing. However, where either Sass's or Croswell's testimony is integral to the Court's analysis, the Court necessarily discusses, in general terms, the nature of that testimony.

something along the lines of: "when I see packaging which is green on top and yellow on the bottom in connection with plant food products, I interpret the packaging design as an indication that the goods come from a single source, i.e., the makers of Miracle-Gro." (Doc. 68, #5636). Sass also testified as to the extensive advertising campaigns, both ongoing and historical, that Scotts uses or has used for the Miracle-Gro brand, along with providing examples of the media attention Miracle-Gro has garnered over the years. (Doc. 68, #5597–633).

Three additional points from Sass's testimony bear noting. First, Sass added some insight into the Trade Dress while attempting to distinguish it from some of the third-party lawn and garden products mentioned above. For example, while comparing the Preen Weed Preventer Plus Plant Food, (DX-1011), to the Trade Dress, Sass pointed to the following visual differences: (1) the Miracle-Gro Trade Dress is "typically one-third green on top, two-thirds yellow on the bottom," while the Preen product uses those colors in different proportions; (2) rather than a horizontal line between the two colors, the Preen product has a sweeping green design superimposed on a yellow background; (3) while Miracle-Gro's logo is a "dark circle that is centered in the middle of the packaging," there is no corresponding circular element on the Preen product. (Doc. 68, #5692) In offering a comparison to another third-party product, Sass again emphasized the "one-thirds green on the top and then the [two-thirds] yellow on the bottom" that is characteristic of Miracle-Gro, and noted the lack of a "dark circle element [on that third-party product] that would be resembling Miracle-Gro." (*Id.* at #5693–94). In short, Sass's testimony suggests that, while Scotts

16

broadly asserts its Trade Dress consists of "a green and yellow color combination" with "the top color taking up a small ratio than the bottom color," (Doc. 2-1, #504), the proportions—one-third and two-thirds—are perhaps more important than it initially suggests. And as far as the Court can tell, the one-third, two-thirds proportion to which Sass testified, along with the dark, circular element, aligns with the products Scotts submitted to the Court.

Second, Sass testified about Scotts' brand-tracking efforts and market-research efforts. While this testimony occurred while the Court was closed to the public, and thus the Court does not share the details,[18] the research suggests, perhaps not surprisingly, that there is substantial overlap between purchasers of plant food and purchasers of weed-control products.

Finally, given the importance of consumer confusion to the analysis here, P&G inquired of Sass on cross-examination whether he was aware of any instances where consumers or retailers expressed confusion between a Miracle-Gro product and Spruce. (Doc. 68, #5650). He admitted he was not. (*Id*.).

While Sass testified as a steward for a long-established and successful brand in Miracle-Gro, Croswell was part of the team seeking to grow Spruce from the ground up. Her testimony largely concerned the development process for Spruce and, most importantly, the package-design process. P&G engaged several third-party vendors to conduct a range of testing on potential packages for Spruce. (Doc. 69, #5883–84). While many alternative packaging designs were considered (with different colors),

---

[18] *See supra* note 17.

Croswell testified that P&G settled on Spruce's dark green because P&G believed it would make Spruce distinctive in the weed-killer market and because it invoked the namesake of the brand (i.e., Spruce trees), among other research-driven reasons. (Def.'s Proposed Findings of Fact & Conclusions of Law, Doc. 71, #6018).

Croswell also testified that, during the design process, P&G was sensitive to concerns about whether the Spruce design might be similar to competitive products. Indeed, during development, P&G and one of the third-party marketing companies it used identified concerns about whether a certain version of the Spruce design may have been too similar to a particular competitive product. But at no point during that process did anyone raise a concern that any version of the proposed Spruce design was too similar to the Miracle-Gro line of products. (*See* Doc. 67, #5395–96). Additionally, while at one point P&G considered expanding the Spruce brand into other product categories in the lawn and garden space, P&G has since abandoned those plans. (*Id.* at #5384–85). Finally, Croswell, much like Sass, testified she was unaware of any instances where consumers or retailers confused Spruce for Miracle-Gro, despite closely monitoring customer feedback during Spruce's rollout. (Doc. 69, #5916–19).

## 2.    Expert Witnesses: Dr. Wind and Dr. Simonson

Both parties submitted consumer survey expert reports in an attempt to show either the likelihood of (Scotts), or the absence of (P&G), consumer confusion between the Miracle-Gro Trade Dress and Spruce's packaging. (Simonson Expert Report; Doc.

30-21; Wind Expert Report, Doc. 61-16). A substantial portion of the hearing was dedicated to exploring alleged problems with those two competing surveys.

Dr. Wind and Dr. Simonson are both accomplished academics with extensive backgrounds in, and qualifications for, conducting consumer surveys. (Doc. 30-21, #1032–37; Doc. 61-16, #4860–4876). The Court finds they are both qualified to offer expert opinions on consumer surveys. But qualifications alone do not guarantee reliable results. The Court provides a brief overview of each likelihood of confusion study conducted,[19] briefly surveying each side's critiques of the other's results along the way.

### a.    Scotts' "Squirt" Survey.

Dr. Wind conducted an online "Squirt survey."[20] Squirt surveys present survey respondents with both of the conflicting marks and "do[] not assume that the respondent is familiar with the senior mark." 5 *McCarthy on Trademarks and Unfair Competition* § 32:174.50 (5th ed.). After screening potential survey respondents to arrive at a group of potential purchasers of Miracle-Gro and Spruce, Dr. Wind assigned those respondents to one of three groups: Home Depot, Lowe's, or Meijer. (Doc. 68, #5712–17). He then further split each of those three groups into two more groups: a test group and a control group. (*Id.* at #5716). After telling respondents to imagine they were considering purchasing a lawn and garden product, he then

---

[19] The Court does not address Dr. Wind's dilution survey because, as explained below, it is unnecessary.

[20] So named for *SquirtCo. v. Seven-Up Co.*, 628 F.2d 1086 (8th Cir. 1980).

proceeded to show respondents in each group in-store displays from the store-groups to which they were assigned.[21] (*Id.* at #5717–20; Doc. 61-16, #4834–36). For example, the Home Depot respondents saw the following photos[22]:



(Doc. 61-16, #4835). Respondents were then shown some of the same photos containing Spruce (an example is depicted immediately below), with red lines surrounding the Spruce products, and asked how they would describe those products to a friend.

---

[21] The one exception for this was the photo for the Lowe's subgroup, which mistakenly included the test stimuli for Home Depot, as Scotts admits. (Doc. 74, #6350 n.3). This mistake alone makes the Lowe's results from Dr. Wind's survey suspect and deserving of little weight for failing to replicate market conditions accurately.

[22] In response to the Court's question at the hearing, Scotts confirmed that the survey respondents were given much higher resolution photos capable of closely zooming in, which the Court cannot reproduce here.



(*Id.*). Finally, the Respondents were shown the in-store display that included Miracle-Gro products along with various other third-party products (the right-most photo in the initial photo array above) and were asked: "Do you believe that any of these products or product lines on this plant food display were made by the same company that manufacturers the products you saw that were circled in red?" (Doc. 68, #5721–22; JX-2018.068). If a respondent answered "yes," they were asked to identify which products by clicking on them. (Doc. 68, #5723; JX-2018.069). Respondents were asked some follow-up questions (e.g., the reason they selected the products). Then the survey went through the same process two more times for slightly different test questions: (1) asking whether respondents thought any of the products or product lines in the display with the Miracle-Gro "ha[d] a business affiliation or connection with the company that manufactures the products you saw that were circled in red"; and (2) asking whether respondents thought any of the products or product lines in

the display with the Miracle-Gro "gave permission or approval to the company that manufactures the products you saw that were circled in red." (Doc 68, #5727–29).[23]

To provide a baseline against which to measure consumer confusion, Dr. Wind separately provided the control groups with the same images and stimuli, except he changed the colors on the Spruce products to black, white, and silver. (*See, e.g.*, JX-2018.251). And he then asked the control group members the same questions about affiliation between products. The idea was that any differences in confusion rates between the two groups would reflect the confusion arising from the color scheme used on the Spruce products (as that was the only change in the stimuli shown to the two different groups).

Dr. Wind next used two independent coders who received general instructions to code these survey responses to identify confusion.[24] (Doc. 68, #5750–51). Those instructions were "to identify confusion," regarding "any reference to the trade dress characteristics of the product," which was "mostly around the green and yellow" component of the Trade Dress. (*Id.* at #5751). So for any of the questions—whether the prompt asking respondents how they would describe Spruce to a friend, why they selected a given product from the plant-food shelf as an associated product, or the follow-up questions—if a respondent mentioned green and yellow in connection with Spruce, the coders tagged that respondent as "confused." (*See id.* at #5546, 5751).

_____

[23] Scotts says this "captured all three dimensions of potential confusion: confusion as to the manufacturer; confusion as to a business association; and confusion as to permission or authorization." (Doc. 74, #6351).

[24] While the coders were apparently provided "a procedure for resolving conflicts between the two coders," the Court is unaware of that procedure and also does not have the actual instructions provided to the coders—only Dr. Wind's testimony. (Doc. 61-16, #4842).

Based on the coded survey responses, Dr. Wind calculated net confusion rates, "[d]ue to explicit reference to the green and yellow packaging," between the Miracle-Gro Trade Dress and Spruce's packaging of 16.2% at Lowe's, 9.1% at Home Depot, and 17.7% at Meijer. (Doc. 61-16, #4846–47). Scotts says anything above 10% is significant. (Doc. 61, #4422; Doc. 74, #6387 (citing to *Mut. of Omaha Ins. Co. v. Novak*, 836 F.2d 397, 400 (8th Cir. 1987))).

P&G has three main issues with Dr. Wind's report: first, that a Squirt survey was inappropriate here; second, that the survey design was leading and suggestive; third, that Dr. Wind's coding of responses—how he determined what counted as "confusion"—was deeply problematic. (Doc. 65, #4908, #4912–22). As to the first, P&G says that a Squirt survey was inappropriate in this instance because Miracle-Gro and Spruce do not appear side-by-side in the marketplace and because a different type of survey, called an Eveready survey, is the appropriate tool to use where one of the marks at issue (here the Miracle-Gro mark) is a strong mark. (*Id.* at #4912–13). Second, it argues that Squirt surveys have an inherently leading nature, which was amplified by certain stimuli in the study here that misstated true market conditions. (*Id.* at #4913–15). For example, P&G complains that in the Home Depot test cell nearly half of the "plant food" display shown to respondents was dominated by a pallet of Miracle-Gro potting mix, which P&G says does not accurately replicate the conditions that most shoppers would experience. (*Id.* at #4915). And as to the last critique, P&G says that Dr. Wind "classified any respondent 'confused' for simply describing the products as 'green and yellow'—even if they mentioned nothing about

23

Scotts or Miracle-Gro." (*Id.* at #4908). In other words, if a respondent accurately noted that the packaging for Spruce products contained the colors green and yellow, that would be coded as reflecting "confusion." Correcting for those purported errant coding decisions, P&G says, would fundamentally alter the results of Dr. Wind's survey. (*Id.* at #4916–21). P&G also takes issue with the phrasing of Dr. Wind's question that asked whether "these products or product lines … gave permission or approval." (Doc. 61-16, #4838). P&G's concern is that products, which are inanimate objects, cannot "give approval," so it believes this question was at best confusing, and at worst nonsensical.[25] (Doc. 65, #4921–22).

### b.    P&G's Aided-Eveready survey.

As noted, P&G also had its own expert, Dr. Simonson, who conducted an online "aided" Eveready study.[26] Eveready studies are "widely regarded as an appropriate method of testing for likelihood of confusion." 5 *McCarthy* § 32:174. Unlike the "Squirt" format, respondents to "Eveready" surveys are not provided an example of the senior mark. Rather, the study assumes that survey respondents "are aware of the [senior] mark from their prior experience." *Id.* Accordingly, this "format is especially useful when the senior mark is readily recognized by buyers in the relevant universe." *Id.*

Dr. Simonson testified that Eveready surveys are "probably the most commonly used methodology," consisting of "mostly open-ended" questions. (Doc. 69,

---

[25] Respondents were instructed they could answer "[d]on't know" to a question. (JX-2019.064).
[26] So named for *Union Carbide Corp. v. Ever-Ready Inc.*, 531 F.2d 366 (7th Cir. 1976).

#5930–31). In a typical Eveready survey, respondents are shown the allegedly infringing products, then asked four standard questions about them. (*Id.* at #5832). Those four questions are:

- Who do you think makes or puts out this product?
- Does the company that makes this product put out any other products?
- Does the company that makes this product have a business affiliation or connection with any other company?
- Did the company that makes this product receive permission or approval from another company?

(Doc. 30-21, #1045).

But Dr. Simonson did not do a typical Eveready survey. Instead, he combined elements of both Squirt and Eveready surveys—using the typical Eveready questions, but displaying multiple products from the marketplace (as would occur in a Squirt survey), instead of the single, allegedly infringing product (the more typical Eveready approach). (Doc. 69, #5832–33; *see also* Doc. 30-21, #1045–46).[27]

Here's how Dr. Simonson's survey worked at a more granular level: 426 potential purchasers of the parties' products were split into one of four groups (two

---

[27] Dr. Simonson says he used an aided Eveready survey that was accepted by the court in *Sazerac Co., Inc. v. Fetzer Vineyards, Inc.*, 265 F. Supp. 3d 1013 (N.D. Cal. 2017), *aff'd*, 786 F. App'x 662 (9th Cir. 2019). (Doc. 30-21, #1045 n.11). He also points to *Bern Unlimited, Inc. v. The Burton Corp.*, No. 11-12278 (D. Mass. Mar. 31, 2015), and *Jackpocket, Inc. v. Lottomatrix NY LLC*, 645 F. Supp. 3d 185 (S.D.N.Y. 2022), *aff'd*, No. 23-12-cv, 2024 WL 1152520 (2d Cir. Mar. 18, 2024). (*Id.* at #1045). As Scotts points out, in *Jackpocket*, the court did not accept Dr. Simonson's conclusion, (Doc. 74, #6400–01), and commented that "there [was] insufficient evidence his survey mirrored or approximated marketplace reality," 645 F. Supp. 3d at 269–70. But the *Jackpocket* court did not disparage the method itself—rather it said it was only appropriate to use "when the products at issue are in fact commonly seen together or one immediately after the other." *Id.* (quotation omitted).

test groups, and two control groups).[28] (Doc. 30-21, #1048–54, 1064). Each respondent then viewed a picture array of products—some variation of this:



(Doc. 30-21, #1039).[29] The respondents were asked to review all the products displayed on the screen "as they would if they were considering purchasing a weed preventer at an online store." (*Id.* at #1059). The respondents then saw one of the four images below, with the Spruce product (or a control version of the Spruce product) blown up on the left-hand side:

---

[28] "All survey respondents indicated that they expected to purchase a weed preventer or weed killer in the subsequent 12 months; most of them had also purchased a weed killer or weed preventer during the previous 12 months." (Doc. 30-21, # 1055). While 426 respondents participated, only 411's responses were considered because 15 spent too little time completing the survey. (*Id.* at #1064).

[29] Note, the red boxes were not displayed for the survey participants. (Doc. 30-21, #1039 n.6). "Half of the respondents saw the two products (or the Miracle-Gro [Shake n' Feed Plus Weed Preventer] and a Control product) literally side-by-side, and the other half saw the two on the same display, but not side-by-side." (*Id.* at #1044, 1048–49).





(*Id.* at #1050–51, 1053–54).[30] Respondents were then asked variations of the four

standard Eveready questions along with follow-up probing questions as necessary.

(*Id.* at #1060–64).

---

[30] The bottom photos display the "control" which Dr. Simonson said "had a different trade dress, but still incorporated green and yellow elements as well as the language and small icons used on Spruce." (Doc. 30-21, #1052). For reasons described below, the Court finds that it need not rely on Dr. Simonson's study. Thus, the Court has no reason to carefully review the study methodology. That said, the Court notes that Dr. Simonson's "control" photo was, in the Court's view, problematic. "A control should share as many characteristics with the experimental stimulus as possible, with the key exception of the characteristic whose influence is being assessed." *Jackpocket*, 645 F. Supp. 3d at 265–66 (quoting Shari Seidman Diamond, *Reference Guide on Survey Research, in* Reference Manual on Scientific Evidence 399 (3d ed. 2011)) (cleaned up), *aff'd*, No. 23-12-cv, 2024 WL 1152520 (2d Cir. Mar. 18, 2024).

Based on the answers, Dr. Simonson found that "only 2.9% of the Test group respondents"—which, recall, refers to those respondents who were shown one of the top two photos with the Spruce product displayed in its actual trade dress—"mentioned either Miracle-Gro or Scotts."[31] (*Id.* at #1066). That led him to conclude that "consumers do not confuse the Spruce product with the Plaintiff or Miracle-Gro products." (*Id.* at #1066–67).

Scotts, unsurprisingly, takes issue with these results. Indeed, it argues that Dr. Simonson's method is problematic for many reasons: failing to replicate marketplace conditions by mimicking an "online purchasing experience"; showing participants only one Miracle-Gro product; selecting ten random products;[32] using a poor control; and coding certain responses incorrectly.[33] (Doc. 74, #6353–54, 6391–

---

Here, the characteristic being assessed was the color combination. But instead of altering solely Spruce's color, as Dr. Wind did for his control, Dr. Simonson created an entirely new shape, maintained the colors green and yellow (but making white the most prominent color), and added a circular graphic element to the top portion of the packaging. (*See* Doc. 30-21, #1053). In many ways, Dr. Simonson crafted a control that was more similar to the Miracle-Gro's Trade Dress than Spruce's current packaging, which may explain why the control group displayed greater confusion than the test group. (*See* Doc. 30-21, #1065–66).

[31] For the control group, those who were shown the Spruce product in the predominantly white trade dress, that number was actually higher—4.4%. (*See* Doc. 30-21, #1065–66 (3.9% in the control group mentioning "Miracle-Gro" and 0.5% mentioning "Scotts")).

[32] Dr. Simonson said he selected the product images (besides Spruce and the Miracle-Gro Shake n' Feed Weed Preventer) by going on Amazon and selecting them. (Doc. 69, #5838). While he admitted there was "no particular criteria," he said that "[t]o the extent … those other brands are lesser known and they are not sold in one or another part of the country, it doesn't matter [because] that just increases the likelihood that respondents will select the brand that has been around the longest, Miracle-Gro." (*Id.*).

[33] Based on the Court's review, there is really only a single significant error in coding Dr. Simonson made—Respondent #1286 who answered "Shake nfeed" should have been coded as confused. (Doc. 74, #6358, 6391–93; JX-2064 (cell AJ220)). Other than that the other identified "errors" by Scotts do not strike the Court as such. The Court sees no reason why respondents who answered "Ortho," "RoundUp," "fertilizer," or the like should have been

400). It also argues that the aided-Eveready method lacks judicial approval. (*Id.* at #6400–04).

After the hearing, the parties submitted proposed findings of fact and conclusions of law. (Docs. 71, 74). So the matter is ripe.

## LEGAL STANDARD

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). Or as the Sixth Circuit puts it, a preliminary injunction "should be granted only if the movant … prov[es] that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002); *see also Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000) (noting that a "preliminary injunction is an 'extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied only in the limited circumstances which clearly demand it'" (cleaned up)). And the plaintiff, as "[t]he party seeking the preliminary injunction[,] bears the burden of justifying such relief." *McNeilly v. Land*, 684 F.3d 611, 615 (6th Cir. 2012).

The Court considers four factors in deciding whether to issue a preliminary injunction: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and

---

coded as confused. (Doc. 74, #6358–59). This case is about Miracle-Gro; not every brand Scotts uses. And Scotts certainly does not have a monopoly on the word "fertilizer."

(4) whether the public interest would be served by the issuance of the injunction." *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 763 (6th Cir. 2019) (cleaned up). No one factor is determinative. *Overstreet*, 305 F.3d at 573. So, for example, a movant could succeed on a request for a preliminary injunction even absent a *strong* likelihood of success. That said, the first prong is unique in that failing to prove at least *some* likelihood of success is "usually fatal" to obtaining injunctive relief, independent of the strength of the other factors. *Gonzales v. Nat'l Bd. of Med. Examiners*, 225 F.3d 620, 625 (6th Cir. 2000). But, "[a]s long as there is some likelihood of success on the merits, the[] [four] factors are to be balanced, rather than tallied." *Hall v. Edgewood Partners Ins. Ctr., Inc.*, 878 F.3d 524, 527 (6th Cir. 2017).

## LAW AND ANALYSIS

The Court addresses the preliminary injunction factors in order, starting with Scotts' likelihood of success on the merits. As explained below, the Court finds that, while Scotts may have *some* chance of success on the merits, it has not shown a *strong* likelihood of succeeding on the merits of its infringement and dilution claims. And Scotts' attempted showings as to the other factors do not outweigh its shortcomings on the first.

### A.    Scotts Has Not Shown that It Has A Strong Likelihood of Succeeding on the Merits on Any of Its Claims.

"The Lanham Act applies to trade dress in addition to trademarks."[34] *Innovation Ventures, LLC v. N2G Distrib. Inc.*, 763 F.3d 524, 536 (6th Cir. 2014). Trade dress cases concern the "image and overall appearance of a product," which "embodies that arrangement of identifying characteristics or decorations connected with a product, whether by packaging or otherwise, that makes the source of the product distinguishable from another and promotes its sale." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 629 (6th Cir. 2002) (cleaned up). In evaluating the "total image of a product," courts look to "features such as size, shape, color, or color combinations, texture, graphics, or even particular sales techniques." *Id.* (quoting *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 764 n.1 (1992)).

There are two ways to assert trade dress infringement claims. First, a plaintiff with a registered trade dress can sue under § 32(1) of the Lanham Act. 15 U.S.C. § 1114(1). But if a plaintiff's trade dress is unregistered, the plaintiff instead must rely on § 43(a) of the Lanham Act. 15 U.S.C. § 1125(a); *Gray v. Meijer*, 295 F.3d 641, 645 (6th Cir. 2022) ("The Lanham Act's protection of registered trademarks also extends to unregistered trade dress."). While the two paths are distinct, they have similarities. Under both, the "touchstone of liability" is "whether the defendant's use of the disputed mark is likely to cause confusion among consumers regarding the

---

[34] And at times, the Court cites to cases involving trademark analysis for trade-dress concepts. The parties and courts alike treat the law from both areas as nearly interchangeable, so the Court does the same.

31

origin of the goods offered by the parties." *Daddy's Junky Music Stores, Inc. v. Big Daddy's Fam. Music Ctr.*, 109 F.3d 275, 280, 288 (6th Cir. 1997).

Here, Scotts asserts four such claims, each of which require it to show confusing similarity between its packaging for Miracle-Gro and P&G's packaging for Spruce.[35] (Doc. 60, #3913–15 (Counts I, II, IV, V)). Scotts' trade-dress-dilution claim, (*id.* at #3914 (Count III)), is the only claim currently before the Court that does not require a showing of likely confusion (although, even there, the similarity between the competing packaging still plays a role). So the Court first addresses the infringement and unfair competition claims, then moves to the dilution claim.

There's one topic the Court needs to address before diving in. At times, Scotts speaks as if the potential benefits accorded to the Registration extends to the Common Law Trade Dress as well. (*See* Doc. 2-1, #501–02). Specifically, it seeks to impart the benefit of incontestability on the entire line of products bearing that trade dress. (*Id.* at #501–02, 506; Doc. 61, #4401–03). The Court is dubious. *See, e.g.*, *Homeowners Grp., Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1106 (6th Cir. 1991) (explaining that the plaintiff could not "make out an infringement case against [the defendant] by showing ownership of one mark … and a likelihood of confusion based on a comparison between a different mark … and [the defendant's] mark"). Indeed, there is some support for the notion that when "trade dress appears on products that are not identical," or, in other words, when a manufacturer is trying to

---

[35] "Both Ohio and federal courts have recognized that the same analysis applies to claims under Ohio's statutory and common law of unfair competition and the Lanham Act." *Abercrombie*, 280 F.3d at 626 n.2. As a result, the Court only explicitly addresses Scotts' federal claims.

extend a single trade dress across multiple different products, courts should more closely scrutinize trade dress claims. *Forney Indus., Inc. v. Daco of Mo., Inc.*, 835 F.3d 1238, 1252 (10th Cir. 2016); *see also Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 380–81 (2d Cir. 1997) (explaining that "a trade dress plaintiff seeking to protect a series or line of products faces the particularly difficult challenge of showing that the appearance of its several products is sufficiently distinct and unique to merit protection as a recognizable trade dress" and requiring articulated common elements that are "sufficiently particular[]"). Regardless, even if the benefits of Scotts' Registration were to extend as far as Scotts wants them to, Scotts would still need to show that there is a strong likelihood that it would succeed on the likelihood-of-confusion front. Said differently, even if the trade dress at issue is "incontestable," that does nothing to prove that an allegedly infringing use gives rise to consumer confusion. *See Progressive Distrib. Servs., Inc. v. United Parcel Serv., Inc.*, 856 F.3d 416, 429–30 (6th Cir. 2017) (explaining "while there is no dispute that incontestable status serves as conclusive evidence of the registrant's exclusive right to use the mark … such use remains subject to proof of infringement as defined in § 1114" (cleaned up)); *Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 632 (6th Cir. 2002) ("Although a trademark may be 'strong and worthy of full protection' because it is valid and incontestable … that does not necessarily mean that its strength is particularly relevant to the ultimate issue of whether confusion is likely to occur." (quotation omitted)).

The Court thus need not, and does not, at this stage definitively determine whether the Trade Dress is incontestable. Rather, the Court proceeds only with the § 1125(a) analysis here (rather than the § 1114(1) analysis), because, as explained below, Scotts has failed to show it has a strong likelihood of proving confusing similarity between the Common Law Trade Dress and Spruce—a requirement under both § 1114(1) and § 1125(a) alike.

1.    **Scotts Does Not Have a Strong Likelihood of Success on Its Trade Dress Infringement and Unfair Competition Claims, Which Require Scotts to Show Confusing Similarity Between Miracle-Gro and Spruce.**

To prevail in a trade dress infringement action under 15 U.S.C. § 1125(a), Scotts "must prove by a preponderance of the evidence: (1) that the trade dress in question is distinctive in the marketplace, thereby indicating the source of the good it dresses, (2) that the trade dress is primarily nonfunctional, and (3) that the trade dress of the competing good is confusingly similar." *Abercrombie*, 280 F.3d at 629. Here, Scotts fails to show it has a strong likelihood of success on the final prong of that test.

a.    **Miracle-Gro's Trade Dress Has Likely Acquired Distinctiveness through Secondary Meaning.**

"An identifying mark is distinctive and capable of being protected if it either (1) is inherently distinctive or (2) has acquired distinctiveness through secondary meaning." *Two Pesos*, 505 U.S. at 769 (emphasis omitted). Trade dress is inherently distinctive when its "intrinsic nature serves to identify a particular source." *Id.* at 768. That is, inherently distinctive trade dresses "almost *automatically* tell a

34

customer that they refer to a brand and immediately signal a brand of product source." *Forney*, 835 F.3d at 1244–45 (quotation omitted). Unfortunately, while the concept is easy to define, determining "[w]hether a product's trade dress is inherently distinctive is not as straightforward." *Id.* at 1245; *see also Spangler Candy Co. v. Tootsie Roll Indus., LLC*, 372 F. Supp. 3d 588, 600 (N.D. Ohio 2019) (stating that "Sixth Circuit case law … provides minimal instruction [as to the inherent distinctiveness] of product packaging and appearance").

Fortunately, the Court need not dive into that morass for present purposes. (*But see* Doc. 30, #712–13 (arguing that Scott is attempting a "sleight of hand [to] expand[] the boundaries of" its Registration)). That's because the Court finds that Scotts is likely to show that Miracle-Gro has acquired secondary meaning. "[N]on-inherently distinctive [trade] dress can have acquired distinctiveness through attachment of secondary meaning, which occurs when, 'in the minds of the public, the primary significance of a [trade dress] is to identify the source of the product rather than the product itself.'" *Abercrombie*, 280 F.3d at 635 (quotation omitted). In the Sixth Circuit, courts apply "a seven-factor test for determining the existence of secondary meaning in trade dress." *Id.* at 640 n.14. Those factors are: "(a) direct consumer testimony; (b) consumer surveys; (c) exclusivity, length, and manner of use; (d) amount and manner of advertising; (e) amount of sales and number of customers; (f) established place in the market; and (g) proof of intentional copying." *Id.*

35

Under those seven factors, Scotts is likely to show that Miracle-Gro has achieved secondary meaning.[36] True, it stumbles a bit out of the gate on the first two factors. One the first, Scotts argues that it has submitted direct consumer testimony, pointing to the 110 customer declarations submitted as part of the USPTO registration process. (*See* Doc. 61, #4408; Doc. 1-2, #104–322). But, while it isn't necessarily problematic that these declarations are from long ago, the fact that they are explicitly directed to a "rectangular shaped box" potentially is. And Scotts hasn't submitted any consumer surveys (factor two) either. But "while survey evidence is the most direct and persuasive evidence of whether a mark has acquired secondary meaning, consumer surveys are not a prerequisite to establishing secondary meaning." *Maker's Mark Distillery, Inc. v. Diageo N.A., Inc.*, 679 F.3d 410, 421 (6th Cir. 2012) (cleaned up).

Those two factors aside, the remaining factors, with the exception of the last (which the Court addresses separately below), overwhelmingly favor Scotts. Scotts has sold products bearing the Common Law Trade Dress for decades, some of them for well over fifty years, in very similar packaging to that in which they are sold today. (Doc. 68, #5561–72). Scotts also spends a significant amount of money on advertising that includes, indeed features, the Miracle-Gro Trade Dress, and it has done so for many years. (*Id.* at #5597–633). Scotts has sold approximately one billion units of, and billions of dollars' worth of, Miracle-Gro Trade Dress products to many customers since 2014. (*Id.* at #5595–96). And Scotts is the leader in the lawn and garden market

---

[36] P&G appears to concede, that at this stage, Scotts has made a showing that it is likely to succeed on the merits as to secondary meaning. (*See* Doc. 71, #6051–52).

largely due to the products it has sold bearing the Trade Dress. (*Id.* at #5556–60). Based on this initial showing, even if lacking in specificity at times, Scotts has shown that it is has a strong likelihood of showing the Miracle-Gro Trade Dress has acquired distinctiveness through secondary meaning.

### b.    Miracle-Gro's Trade Dress Is Probably Non-Functional.

"Only nonfunctional, distinctive trade dress is protected under [the Lanham Act]." *Two Pesos*, 505 U.S. at 775. "The functionality doctrine prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature." *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 164 (1995). "[A] product feature is functional, and cannot serve as a trademark, if it is essential to the use or purpose of the article or if it affects the cost or quality of the article, that is, if exclusive use of the feature would put competitors at a significant non-reputation-related disadvantage." *Id.* at 165 (cleaned up).

Neither party spent substantial time on this element, either in their briefing or proposed conclusions of law. (*See generally* Docs. 2-1, 30, 61; Doc. 71, #6048 n.6; Doc. 74, #6375). Indeed, P&G, at least at this stage of the litigation, proposes that the Court assume Scotts' Trade Dress "is primarily nonfunctional." (Doc. 71, #6048 n.6). The Court does so because it sees no way in which the Miracle-Gro Trade Dress—at

least understood as including the color combination along with the shape—could be functional.[37]

        **c.    Scotts' Has Not Demonstrated a Strong Likelihood that It Can Show Consumer Confusion between Miracle-Gro's Trade Dress and Spruce's Packaging.**

Whether there is a likelihood of confusion between two products ultimately comes down to "whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way." *Homeowners*, 931 F.2d at 1107 (quotation omitted). Broadly speaking, three basic categories of evidence inform the confusion inquiry: (1) evidence about the appearance of the competing products themselves that could give rise to a reasonable inference that confusion may exist (e.g., are the marks close enough to give rise to a reasonable inference of confusion by the finder of fact due to their similarity?); (2) evidence of actual confusion in the marketplace (e.g., consumers calling Company A (the trade dress owner) to complain about a product that they assumed Company A made, even though it was in fact Company B that made it); and (3) consumer confusion surveys (which are empirical tools designed to detect and predict the likelihood of confusion). Here, Scotts' own witness admitted that there is no evidence of actual consumer confusion, so it

---

[37] The shape itself, a rectangular box, arguably is functional in the sense that you can more efficiently stack rectangular boxes on shelves than you can with many other shapes of containers. This just illustrates a broader point. In answering many of the relevant questions for the analysis in this Opinion and Order, the Court is often forced to first decide what is included in the trade dress at issue: just the colors, the colors in proportion (one-third green, two-thirds yellow), the colors in order (green over yellow), the colors plus the black circle separating the colors, the black circle with the "Miracle-Gro" in it, the shape of the container, or a combination of some (or all) of the above. And if a combination, the Court must also determine what the minimum constituents of such a combination would need to include in order to constitute the Miracle-Gro Trade Dress.

basically comes down to the Court's assessment of the objective likelihood of confusion based on the products and packaging, along with the evidentiary value of the competing consumer surveys the parties tendered.

While that is the basic conceptual framework, the Sixth Circuit has attempted to further clarify the inquiry by adopting eight factors, known as the *Frisch* factors, for assessing the issue of confusion. These are:

> (1) strength of the plaintiff's mark;
>
> (2) relatedness of the goods;
>
> (3) similarity of the marks;
>
> (4) evidence of actual confusion;
>
> (5) marketing channels used;
>
> (6)  likely degree of purchaser care;
>
> (7) defendant's intent in selecting the mark;
>
> (8) likelihood of expansion of the product lines.

*Frisch's Rests., Inc. v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d 642, 648 (6th Cir. 1982). Consistent with the somewhat subjective nature of the underlying inquiry, there is "no mathematical precision" involved in applying these factors; rather they serve as "a guide to help determine whether confusion is likely." *Homeowners*, 931 F.2d at 1107. "[N]ot all of these factors may be helpful in any given case" and they can be "interrelated." *Id.*

That said, "the two most important *Frisch factors* [are the] strength of the mark and similarity of the trade dress." *Gray*, 295 F.3d at 646. And that makes some sense. After all, what it means for trade dress to be "strong" is that products bearing that "look" are closely associated with a single source. The stronger that connection in consumers' minds, the more likely a consumer may be to think that a close-but-

not-perfect match—one that evokes the superior mark, even if not exactly matching it—would also come from that same source. For similar reasons, the more the allegedly infringing mark resembles the superior mark, the more likely a consumer would be to assume it is the same manufacturer. So while the Court addresses all eight factors on this list, it does so with particular attention to those two factors, and remains mindful throughout that the ultimate question is whether a reasonable consumer is likely to be confused. That framing and focus ends up causing problems for Scotts, because here the similarity of the marks—or rather the lack thereof—cuts strongly against a finding of confusion.

### i.    Strength of the Trade Dress

The first *Frisch* factor assesses the trade dress's "distinctiveness and degree of recognition in the marketplace." *Homeowners*, 931 F.2d at 1107. "The stronger the [trade dress], all else equal, the greater the likelihood of confusion." *Id.* The "[s]trength of a plaintiff's trade dress depends upon the interplay of two elements, the uniqueness of the trade dress and the investment in imbuing a trade dress with secondary meaning." *Gray*, 295 F.3d at 647. These two components are best thought of in terms of "conceptual" and "commercial" strength, respectively. *Maker's Mark*, 679 F.3d at 419–20. This dichotomy allows for courts to classify even "the most mundane packaging" as strong, given the appropriate advertising and promotion; but it also permits courts to consider "particularly unique packaging even without any artificial efforts to establish a secondary meaning" as "strong trade dress" too. *Gray*, 295 F.3d at 647.

The Court begins its analysis with the Trade Dress's commercial strength. For the same reasons that Miracle-Gro has likely achieved secondary meaning, the Court finds that it has substantial commercial strength. *Heaven Hill Distilleries, Inc. v. Log Still Distilling, LLC*, 575 F. Supp. 3d 785, 822 (W.D. Ky. 2021) ("Commercial strength and secondary meaning turn on the same factors."). Scotts (or the predecessor company that owned the Miracle-Gro Trade Dress) has invested substantial effort and large sums of money over an extended period of time in promoting the Miracle-Gro products bearing the Trade Dress. And those efforts undoubtedly have resulted in consumer awareness of that packaging.

The Common Law Trade Dress's conceptual strength, however, is another matter. The conceptual strength, or inherent distinctiveness of trade dress can be difficult to assess. *See Kibler v. Hall*, 843 F.3d 1068, 1073 (6th Cir. 2016) ("[A mark] cannot be conceptually strong unless it is inherently distinctive."). That said, reliance on colors alone probably won't cut it. As the Tenth Circuit observed, "the use of color in product packaging can be inherently distinctive (so that it is unnecessary to show secondary meaning) *only if* specific colors are used in combination with a well-defined shape, pattern, or other distinctive design." *Forney*, 835 F.3d at 1248 (emphasis added).

Against that backdrop, Scotts asserts that the Miracle-Gro Trade Dress is "highly distinctive, as the combination of five unrelated elements creates a unique, visually attractive, and consumer-friendly commercial impression." (Doc. 2-1, #507). That may be true as stated, but it turns, at least to some extent, on exactly what

41

comprises the "trade dress" at issue. Scotts has offered two different, but related, answers to that question. According to Scotts' briefing, that trade dress comprises the following:

(1) A green and yellow color combination;

(2) With each color presented as a separate horizontal band and the top color taking up a smaller ratio than the bottom color;

(3) With the two bands sharing a common border that runs horizontally along the package;

(4) With a straight line dividing the two colored bands; and

(5) A circular horizontally centered graphic element.

(Doc. 60, #3899–900). But at the hearing, Scotts seemed to indicate that proportions (one-third, two-thirds) also mattered. Indeed, on all products exhibiting the Miracle-Gro Trade Dress (even the related specialty products in a different color scheme), the proportionality of the colors (one-third, two-thirds) remains the same. The products themselves also seem to suggest that the order of the green and yellow matter (on all of the products bearing the Trade Dress, the green is above the yellow). Beyond that, the "circular horizontally centered" element is a black circle that appears at the dividing line between the color bands.

Considering all of these elements in combination, the Court concludes there is likely *some* conceptual strength to the Trade Dress—at least when the colors are used in the cited proportions and with the distinctive circle marker between the two. Additionally, the black-circle element appearing at the dividing line between the colors appears to be the true throughline (even more than the green and yellow combination) for Miracle-Gro products, which supports the Court's finding that there's some conceptual strength.

42

But when you start subtracting individual elements from that combination, the distinctiveness quickly vanishes. For example, as P&G aptly notes, based on the products presented at the hearing, there's nothing particularly distinct about using green and yellow for packaging in the lawn care industry. Indeed, P&G says (and the evidence largely showed) that green and yellow color combinations abound in the lawn and garden space, perhaps because they "are the colors of sunshine and plants." (Doc. 30, #722). Plus, P&G also points out that Scotts sells products in the Miracle-Gro family in packaging that is inconsistent with the Trade Dress, or at least inconsistent with how Scotts wants the Court to understand the contours of the Trade Dress in this action. Both of these considerations sap at least some of the conceptual strength of the Trade Dress—particularly if the Trade Dress is broadly understood. And to further illustrate why, the Court dives a little deeper into each.

First, third parties can muddle the distinctiveness of a given trade dress by using a similar trade dress on competing products. *See Progressive*, 856 F.3d at 429. That is because a given trade dress tends to lose its ability to act as "an identifier for a single source" when there are other similar-looking products in the same market. *Id.* True, it is incumbent on the defendant to establish that competing use by "show[ing] what actually happens in the marketplace," including "the nature and extent of use by third-party users." *Homeowners*, 931 F.2d at 1108. But here P&G did just that. During its cross-examination of Sass, P&G elicited testimony that several other products make use of a combination of green and yellow (e.g., Preen, Sprectacide, and Sunday), all of which perform well in the market. (*See e.g.*, Doc. 68,

#5655–67). While the Court is not suggesting that consumers would confuse Miracle-Gro with any of these products, the similar color combinations (and in some cases package shapes) between these products' packaging and the Miracle-Gro Trade Dress diminishes the Trade Dress's capacity to act as an identifier of a single source (at least if Scotts contends that the Trade Dress broadly extends to any combination of green and yellow packaging).

Second, Scotts' renditions of its Trade Dress for its specialty Miracle-Gro products detracts, at least a little, from its core Trade Dress. True, Scotts is correct that it may define the product lines it sees fit to associate with its Trade Dress. (Doc. 61, #4403 (citing *Innovation Ventures, LLC v. N2G*, 635 F. Supp. 2d 632, 642 (E.D. Mich. 2008) ("[A court] does not have to consider all of [p]laintiff's products in deciding whether the line has a consistent overall look. Rather [a court need] only consider the products and packaging for which Plaintiff is seeking trade dress protection."))). So the fact that some products in the Miracle-Gro line of products include color combinations other than green and yellow is certainly not fatal to its claims here.

But just because Scotts excludes some of its products from those as to which it claims trade-dress protection does not mean that those products play no role in this case. One-third of Miracle-Gro products are sold in different packaging from the Trade Dress because they are "specialty products." (Doc. 68, #5616–17, 5680). The Court finds that these non-conforming products (i.e., products that use a color combination other than green and yellow) may weaken the "intrinsic nature" of the

44

Trade Dress's ability to "identify a single source," *Two Pesos*, 505 U.S. at 768, at least if the Trade Dress is understood as including the green and yellow color combination. That's because the more consumers come into contact with Miracle-Gro products with a different style of packaging, and in particular different color combinations, the less likely they are to look for the green and yellow combination as identifying their favorite lawn and garden product. (At the risk of undue repetition, the black circular element, which appears on *all* of the Miracle-Gro packages, independent of color, struck the Court as a uniquely important part of the Miracle-Gro Trade Dress.)

Nonetheless, all of that said, the Court finds that Scotts has shown, at least for purposes of the preliminary injunction stage, that there is some conceptual strength to Miracle-Gro's Trade Dress to go along with its substantial commercial strength. So, considering the interplay of these two components, this first factor weighs at least somewhat in Scotts' favor.

### ii.        Relatedness of the Goods

Courts use three categories to assess the relatedness of the goods at issue: "(1) direct competition of services, in which case confusion is likely if the marks are sufficiently similar; (2) services are somewhat related but not competitive, so that likelihood of confusion may or may not result depending on other factors; and (3) services are totally unrelated, in which case confusion is unlikely." *Homeowners*, 931 F.2d at 1108. In evaluating which category is appropriate, courts focus on the functions of the goods at issue. *Daddy's Junky*, 109 F.3d at 283.

Scotts argues that its Miracle-Gro products are directly competitive with Spruce because *one* of the products bearing the Trade Dress is a "Weed Preventer." (Doc. 2-1, #508).



(*Id.* at #497; JX-2146). In the alternative, it argues that all of its Trade Dress products are at least somewhat related since they are in the lawn and garden category. (Doc. 2-1, #508). The Court disagrees with Scotts' first argument, but largely agrees with the second.

Miracle-Gro products and Spruce serve different functions so they are not directly competitive. The single product Scotts points to in its Miracle-Gro product line as directed at weeds is a weed *preventer*; Spruce by contrast is a weed *killer*. *See also Maker's Mark*, 679 F.3d at 423 (according the relatedness "factor little weight because" bourbon and tequila "are competitive only within a very broad category and are only somewhat related" and finding it "more appropriate to concentrate … on other factors"). Take two hypothetical customers. Johnny has some weeds that have sprouted between the bricks outside his home. When he goes to the store, he is looking for a product to destroy those weeds. Miracle-Gro Weed Preventer would not fill the bill. (*See* Doc. 68, #5561). Spruce does. Meanwhile, there's Jimmy, who is planning on

planting some flowers in his garden. He does not want any weeds to steal the show from his flowers—that is, he wants to prevent them from growing in the first instance. He would not buy Spruce (indeed, Spruce might kill his flowers). (Doc. 30-1, #751). Instead, Weed Preventer is the product he should use. They are not interchangeable.

That said, Miracle-Gro and Spruce also are not completely unrelated. Sass testified convincingly about the overlap of customers between the products. Intuitively that makes sense. While Johnny and Jimmy may need two different products for two different needs, it isn't farfetched to believe that someone working on their yard may want to purchase both products for a single day of yardwork. So, even though products in the same broad industry are not necessarily related, *see Daddy's Junky*, 109 F.3d at 282–83, common sense connects these two products, at least to some degree. But since the products are only somewhat related, this factor makes confusion neither more nor less likely.

### iii.    Similarity of the Trade Dress

That brings the Court to the third, and in many ways most important, factor—similarity of the trade dress. After all, absent at least *some* similarity, it is difficult to see how confusion would arise. Not to mention, the greater the similarity, the greater the likelihood of confusion. Consistent with that, the Sixth Circuit has opined that a "defendant's resounding success on this factor makes the plaintiff's burden of prevailing on the seven other *Frisch's* factors effectively insurmountable." *Abercrombie*, 280 F.3d at 648.

47

"In assessing similarity, 'courts must determine whether a given mark would confuse the public when viewed alone, in order to account for the possibility that sufficiently similar marks may confuse consumers who do not have both marks before them but who may have a general, vague, or even hazy, impression or recollection of the other party's mark.'" *Maker's Mark* 679 F.3d at 421 (quoting *Daddy's Junky*, 109 F.3d at 283). But how exactly does a Court go about evaluating the visual similarity of two products' packaging? The Sixth Circuit has made clear that the analysis does not rest on a side-by-side, element-by-element comparison. *See, e.g.*, *Homeowners*, 831 F.2d 1109; *Therma-Scan*, 295 F.3d at 633. Instead, "[i]t is the overall impression of the mark, not an individual feature, that counts." *Homeowners*, 831 F.2d 1109. But that overall visual impression naturally arises from the combination of elements that appears on the plaintiff's packaging and the accused packaging. As a result, while disclaiming a mechanical element-by-element comparison, the Sixth Circuit has also observed that this factor is best assessed "by actually comparing the [plaintiff's] packaging with the [defendant's] packaging" and then assessing the differences between the key elements of each package at issue. *See Gray*, 295 F.3d at 648.

*Gray* is instructive. There the Sixth Circuit compared two popcorn packaging trade dresses. *See id.* Both packages indicated the popcorn was "Chicago Style" and contained silhouettes of the Chicago skyline. *Id.* But, the court explained, the skyline images were "in different places on the package (middle v. bottom)" and "look[ed] very different." *Id.* And the court found several other key differences: it found the graphic elements between the two packages to be distinct; there were distinct brand labels;

and "though using similar colors, the design layout[s] of the bags [were] sharply different." *Id.* So the court determined that the trade dresses were dissimilar. *Id.* In short, while an element-by-element analysis is an inappropriate basis for disproving similarity, differences (not surprisingly) still matter to the analysis of the "general impression" created by the two competing packages.[38] *Id.*; *see also Abercrombie*, 280 F.3d at 647–48 (conducting a "visual inspection of [] two catalog designs" and determining that "[t]hey contain[ed] too many significant dissimilarities, in terms of both style, layout, and content … to conclude otherwise").

How does that all play out here? Scotts argues that Spruce's packaging is "nearly identical" to the Miracle-Gro Trade Dress. It makes that claim, though, only by broadly pointing to the same collection of five elements that Scotts alleges (at least in its briefing) make up the Trade Dress. (Doc. 2-1, #508–09). But a more holistic comparison of the overall visual impression created by the product packaging, even when assessed in light of Scotts' proposed five elements, results in a finding of dissimilarity between Miracle-Gro and Spruce. Take each in turn.

Start with the green and yellow color combination. True, both Spruce and Miracle-Gro use these colors. But not all greens and yellows are the same. As already

---

[38] The Court notes that the Sixth Circuit seems primarily to take issue with "technical differences implied by a 'side-by-side comparison.'" *Gray*, 295 F.3d at 648; *see also Innovation Ventures*, 763 F.3d at 537 ("We do not approach trade dress claims by parsing minute differences between products."). In other words, the Sixth Circuit may be merely discouraging the lower courts from attempting to nit-pick minor visual differences when "using [their] eyes" to compare the competing trade dresses. *Innovation Ventures*, 763 F.3d at 537. Thus understood, the admonition seems apt. As Scotts correctly argued at the hearing, trade dress is not like a patent claim, where each element must be present either literally or under the doctrine of equivalents. That said, determining similarity, by its very nature, seems to require some sort of comparison of the two competing trade dresses.

noted, especially when viewed in person, the Trade Dress and Spruce packaging use very distinct shades of green—Spruce's green is much darker and the finish is matte rather than glossy. Moreover, Spruce's packaging employs a transparent section, while Miracle-Gro's Trade Dress is entirely opaque.

Next, take the "separate horizontal band[s]" of those colors with the top having a smaller ratio than the bottom. (Doc. 2-1, #504). True, by failing to provide any specifics about this "ratio" in its filings, Scotts renders the element capable of encompassing both Miracle-Gro and Spruce. But the problem for Scotts is that Sass made clear (as do the Scotts' Miracle-Gro products themselves) that the ratio is a clearly defined one—one-third green on top, two-thirds yellow on bottom. (*See, e.g.*, Doc. 68, #5692–94). With that greater specificity in mind, Spruce is not similar. Its packaging employs a clear, bottom portion (perhaps one-fifth of the package), then dark green predominates over most of the rest. While there is a yellow portion, it is relatively small and is used to highlight a message—"Visible Results in **1 HOUR**."[39]

The Court addresses Scotts' third and fourth Trade Dress elements together, because while somewhat muddled, they appear to work together. Scotts is correct that on both the Trade Dress and Spruce packaging the colors "shar[e] a common border that runs horizontally along the package" in the form of "a straight line dividing the

---

[39] The Court does note that on Spruce's 24-ounce spray bottle, the yellow portion is substantially larger than on the other configurations. For the other reasons stated in this section, however, it doesn't change the result for Scotts as to this specific configuration.

two colored bands." (Doc. 2-1, #504). But these visual elements are wholly unremarkable and add little to the overall visual impression of each product.[40]

As for the last element, Scotts is right that both products contain a "horizontally centered graphic element." (*Id.*). But the Trade Dress's graphic element is the Miracle-Gro logo, which is white text on a black circle with some additional features. Spruce, by contrast, has a circular yellow dandelion (with different graphics on each half) overlaid on a dark green background. Moreover, the circular graphics are "in different places on the package ([top] v. bottom)." *Gray*, 295 F.3d at 648. The dissimilarity on this element could not be more stark.

Additionally, in assessing the "overall visual impression," the Court notes other dissimilarities between the Miracle-Gro Trade Dress's and Spruce's "size, shape, color, or color combinations, [and] graphics." *Abercrombie*, 280 F.3d at 629, 647 (quotation omitted). For example, the products' actual containers are quite distinct from one another. Out of all the packaging configurations between the five configurations of Spruce and the entire Miracle-Gro product line, none of them even remotely resemble each other in shape. Moreover, Scotts avoids including text in the top portion of the Trade Dress; P&G does not. (Doc. 68, #5676). The graphics used on the two meaningfully differ as well. Miracle-Gro typically incorporates photorealistic images of vegetation on its packaging (e.g., flowers, bell peppers, tomatoes), while P&G employs graphic design-like elements (e.g., an outlined paw print). Finally, as

---

[40] What's more, if one looks closely at the Trade Dress, the horizonal, straight line dividing the green and yellow is actually an additional element—a gold line. On the Spruce packaging, by contrast, there is no line at all (the green and yellow portions touch without a dividing line).

51

P&G points out, it prominently displays the Spruce trademark on it packaging, which creates its own distinct visual impression. (Doc. 30, #732). And that is important because "the presence of a house mark … decreases the likelihood of confusion." *Maker's Mark*, 679 F.3d at 422; *see also Autozone, Inc. v. Tandy Corp.*, 373 F.3d 786, 796–97 (6th Cir. 2004); *Abercrombie*, 280 F.3d at 647.

These visual differences add up to a highly dissimilar overall visual impression between the Miracle-Gro Trade Dress and the Spruce packaging. The Court finds this is an instance where the trade dresses at issue are "clearly distinguishable and would appear so to all but the most obtuse consumer." *Abercrombie*, 280 F.3d at 648 (quoting *Haagen-Dazs, Inc. v. Frusen Gladje Ltd.*, 493 F. Supp. 73, 75 (S.D.N.Y. 1980)). As a result, this factor—perhaps the most important factor to the consumer confusion analysis—weighs heavily in P&G's favor.

### iv.  Evidence of Actual Confusion

"Even though evidence of actual confusion is undoubtedly the best evidence of likelihood of confusion it does not follow that any type or quantum of such evidence is entitled to significant weight in the determination." *Homeowners*, 931 F.2d at 1110. Instead, "the weight to which such evidence is entitled varies depending upon the type and amount of confusion that occurs." *Therma-Scan*, 295 F.3d at 634. Because evidence of actual confusion can be hard to come by, courts allow survey evidence to establish evidence of actual confusion. *See, e.g.*, *Fortune Dynamic, Inc. v. Victoria's Secret Store Brand Mgmt., Inc.*, 618 F.3d 1025, 1035 (9th Cir. 2010). But this "is so only to the extent that the survey mirrors the real world setting which can create an

instance of actual confusion." 3 *McCarthy* § 23:2.50. "Where a survey presented on the issue of actual confusion reflects methodological errors, a court may choose to limit the importance it accords the study in its likelihood of confusion analysis." *Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*, 502 F.3d 504, 518 (6th Cir. 2007).

Here, Scotts admits there have been no incidents of actual confusion. (Doc. 68, #5650). Instead, Scotts relies on Dr. Wind's likelihood of confusion survey as evidence of likely confusion; P&G, in turn, offers Dr. Simonson's survey to show there is an absence of likely confusion.

Start with Dr. Wind. The Court finds that his survey is teeming with problems. To begin, the Court agrees that Scotts likely erred in conducting a Squirt survey here. The products at issue are typically not displayed side-by-side in a retail setting, nor was there a sufficient showing that the typical consumer sees them sequentially. Moreover, as explained above, Miracle-Gro is a commercially strong mark. All of those factors support using an Eveready survey, not a Squirt survey. *See* 5 *McCarthy* §§ 32:174 & 32:174.50 (the latter explaining that Squirt methodology is inappropriate unless there are "a significant number of real world situations in which both marks are likely to be seen in the marketplace sequentially or side-by-side").

More problematic still was the structure of Dr. Wind's survey. For example, while Scotts acknowledged—indeed stressed—the importance of replicating actual retail conditions in conducting the survey, (Doc. 68, #5526–27), the Lowe's groups in Dr. Wind's survey mistakenly saw photos from a Walmart instead of a Lowe's, (*id.* at #5542). Along the same lines, the Court finds it unlikely that large pallets of Miracle-

Gro potting mix typically sit directly in front of Home Depot's plant food shelves (or at least, that customers typically would stand behind such a pallet while selecting something on the plant food shelf). (*See* Doc. 61-16, #4835). Simply put, the Home Depot photo was highly suggestive.

But it was the coding of certain responses as "confused" in Dr. Wind's survey that the Court finds the most troublesome. P&G identified a significant number of responses that clearly should not have been coded in that manner—namely, respondents who referenced "Spruce" in their answers, and who did not mention "Miracle-Gro" or "Scotts" at all, but who happened to mention that the Spruce bottle was green and yellow (which it is). (*See* Doc. 65, #4916–18). Because Dr. Wind's survey is replete with such coding errors, as well as problematic test stimuli, the Court gives his report little to no weight.

Turning to Dr. Simonson's survey, Scotts argues that the survey did not replicate market conditions, used an improper control, and had other flaws. (Doc. 61, #4419, 4423). That may be. But because Scotts has not made an affirmative showing of confusion on this factor, the Court need not address all Scotts' concerns with Dr. Simonson's study at this time.

In short, the Court finds that Scotts has failed to offer convincing consumer survey evidence of confusion. So this factor does not count in its favor.

### v.    Marketing Channels Used

The fifth *Frisch* factor requires the Court "to consider the similarities or differences between the predominant customers of the parties' respective goods" and

to analyze whether the marketing approaches by each party resemble each other. *Daddy's Junky*, 109 F.3d at 285. On the one hand, "dissimilarities between the predominant customers of a plaintiff's and defendant's goods or services lessens the possibility of confusion." *Homeowners*, 931 F.2d at 1110. On the other, "if the services of one party are sold through different marketing media in a different marketing context than those of another seller, the likelihood that either group of buyers will be confused by similar service marks is much lower than if both parties sell their services through the same channels of trade." *Id.*

The parties sell their products in all of the same stores (and through similar online channels). And while stores like Home Depot and Lowe's sell the parties' products in different parts of the stores, major retailers like Walmart and Meijer often house their products in the same aisles. (*See, e.g.*, Doc. 68, #5589–90; Doc. 69, #5877– 79). The Court also finds Sass's testimony concerning customer overlap persuasive at this juncture. Accordingly, this factor weighs in Scotts' favor.

### vi.    Likely Degree of Purchaser Care

"The degree of care with which consumers likely purchase the parties' goods or services may affect the likelihood of confusion." *Daddy's Junky*, 109 F.3d at 285. But "[t]he ultimate significance of a given degree of care, however, often will depend upon its relationship with the other seven factors." *Id.* The Sixth Circuit explained how this factor is tied most closely to the third *Frisch* factor:

> The effect of purchaser care, although relevant, will be less significant than, or largely dependent upon, the similarity of the marks at issue. If the District Court ultimately determines that the marks are not very similar, then even a high degree of purchaser care will decrease only

slightly the already low likelihood of confusion. Similarly, if the District Court finds that the marks are quite similar, then purchaser care will decrease the likelihood of confusion only minimally because the care and skill which a purchaser will have used when deciding which instrument to buy will not have necessarily extended to his decision regarding which retailer to buy from. That is, confusingly similar marks may lead a purchaser who is extremely careful and knowledgeable about the instrument that he is buying to assume nonetheless that the seller is affiliated with or identical to the other party.

*Id.* at 286. For "an ordinary buyer, the standard for determining whether he or she would differentiate between products with similar trademarks is the exercise of ordinary care." *Therma-Scan*, 295 F.3d at 638. An example helps in this context: fast-food buyers exert a low degree of care because they are typically "impulse buying." *See Frisch*, 670 F.2d at 648. In contrast, "when a buyer has expertise or is otherwise more sophisticated with respect to the purchase of the [goods] at issue, a higher standard is proper." *Homeowners*, 931 F.2d at 1111 (finding that real estate broker customers had a high degree of care because real property sales involved significant commercial transactions).

Ultimately, the Court finds this factor does not tip the balance in either direction. Customers of lawn and garden products are not buying fast food, but neither are they buying houses. As this factor is closely linked to the third *Frisch* factor, the Court does not expect customers to be confused, even if exerting a low degree of care because of the distinct overall visual impressions between the products. While P&G argues, based on its own research, that purchasers of herbicides exert a high degree of care, (Doc. 30, #737–38), the Court is unpersuaded—Scotts' critique of the research is well taken. But even so, this factor is essentially a non-factor.

56

### vii.    Defendant's Intent in Selecting the Mark

"If a party chooses a mark with the intent of causing confusion, that fact alone may be sufficient to justify an inference of confusing similarity." *Homeowners*, 931 F.2d at 1111. But "if there is no real issue of a likelihood of confusion, evidence of copying is of no import." *Gray*, 295 F.3d at 651. Awareness of a mark can potentially support an inference of intentional copying. *Daddy's Junky*, 109 F.3d at 286–87. But while "[c]ircumstantial evidence of copying … may be sufficient to support an inference of intentional infringement where direct evidence is not available, … knowledge of a trademark, alone, will not support a finding of intent to confuse if other circumstances how that defendant believed there was no infringement." *Progressive*, 856 F.3d at 436.

Scotts says there are three pieces of circumstantial evidence that should lead to a finding of intent. First, the fact that P&G considered other packaging designs with different color schemes during Spruce's development process. (Doc. 61, #4427–29). Second, that some of the third-party reports prepared for P&G, as part of Spruce's packaging development process, featured images of Miracle-Gro products. (*Id.*). Third, that P&G clearly had knowledge of Scotts' rights to the Miracle-Gro Trade Dress because Scotts sent P&G a letter expressing concerns about confusing similarity between the products' designs in May 2024. (*Id.* at #4429).

But that purported evidence is attenuated at best. For the first point, Croswell offered compelling, in-depth testimony for why Spruce's color scheme was selected amongst the alternatives, and specifically detailed the market research and consumer testing backing the decision. (*See, e.g.*, Doc. 69, #5892–93, 5897–5912). It seems

57

natural to the Court that a product development team might consider different colors and designs, then test those options before going to market.

As to Scotts' second point, it essentially argues that a third-party packaging-design study's inclusion of a few images of Miracle-Gro products (along with many, many other lawn and garden care products) constitutes evidence that P&G intentionally copied the Miracle-Gro Trade Dsress. (*See* Doc. 74, #6341, 6409; Doc. 61-4; JX-2001). The Court doesn't see it that way. The presence of Miracle-Gro's images in a sixty-plus page report on the lawn care industry does not strike the Court as surprising. Scotts is the category leader; you would expect some of its products to appear in any report about the market.

Finally, the Court finds the letter Scotts sent to P&G inconsequential. It is unsurprising Scotts sent the letter. And in any event, the letter has no bearing on whether P&G intended to cause confusion—by the time Scotts sent it, the Spruce packaging design was nearly finalized.[41]

Because this factor "does not carry significant weight if no evidence of intentional infringement exists," *Therma-Scan*, 295 F.3d at 639, and since "[i]ntent … is an issue whose resolution may benefit only the cause of a senior user, not of an alleged infringer," *Daddy's Junky*, 109 F.3d at 287, the Court accords no weight to this factor.

---

[41] The Court does note that one feature of the Spruce packaging was excised between May 2024 and its November 2024 launch—a small circular graphic on the upper portion of the packaging. (Doc. 69, #5915–16). While Scotts may argue that shows P&G was trying to make its packaging less similar to the Miracle-Gro Trade Dress in response to the letter, Croswell testified that the omission was really due to a belief that it made the packaging look "too cluttered." (*Id.* at #5916).

### viii.   Likelihood of Expansion of the Product Lines

"[A] 'strong possibility' that either party will expand his business to compete with the other or be marketed to the same consumers will weigh in favor of finding that the present use is infringing." *Homeowner's*, 931 F.2d at 1112 (citing Restatement of Torts § 731(b) & comment c (1938)). But "a finding of little evidence of expansion plans is accorded little to no weight." *Maker's Mark*, 679 F.3d at 424.

Scotts argues that, at one point, some third-party reports prepared for P&G referenced potential expansion of Spruce into other, more directly competitive product categories, and that P&G represented the same at one point. (*See* Doc. 61, #4430). But based on Croswell's testimony, P&G has abandoned those plans. (Doc. 69, #5890–91). Similarly, Sass testified that Scotts has no intention to launch a Miracle-Gro weed killer. (Doc. 68, #5682–83). As a result, the Court accords this factor no weight.

*     *     *

Considering the factors together, Scotts has not met its burden of showing that it is strongly likely to succeed on the merits of its consumer-confusion-based infringement and unfair competition claims. At bottom, the overall visual impressions of the Trade Dress, on the one hand, and Spruce's packaging, on the other, are simply too distinct. And that's an "effectively insurmountable" mountain for Scotts to climb, even if some of the other factors weigh in its favor. *Abercrombie*, 280 F.3d at 648. So while the Court finds Scotts' Trade Dress does have some strength, and the products are marketed in the same stores to similar customers, that isn't enough.

2.    **Scotts Is Also Unlikely to Succeed on Its Dilution Claim at This Time.**

In contrast to infringement claims, dilution claims do not require a likelihood of confusion showing. *Homeowners*, 931 F.2d at 1105 n.1. Instead, Scotts must show that it has a strong likelihood of success measured against the five-part dilution test the Sixth Circuit employs: "The senior mark must be (1) famous; and (2) distinctive. Use of the junior mark must (3) be in commerce; (4) have begun subsequent to the senior mark becoming famous; and (5) cause dilution of the distinctive quality of the senior mark." *Autozone*, 373 F.3d at 802. But as to that fifth element, while *confusion* is not an issue, the *similarity* of the competing trade dresses does matter. *Id.* at 802–03. And, notably, "[t]he 'similarity' test for dilution claims is more stringent than in the infringement milieu." *Id.* at 805–06.

As noted above, the Court finds a high level of dissimilarity between the Miracle-Gro Trade Dress and the Spruce packaging. As a result, at this stage of the litigation, the Court cannot say that Scotts has a strong likelihood of success on its dilution claim.

Overall, then, Scotts has not demonstrated a strong likelihood of success as to any of the claims it advances in this litigation. That factor weighs against its request for a preliminary injunction.

B.    **Scotts Has Not Demonstrated It Would Be Irreparably Harmed Absent a Preliminary Injunction.**

Scotts must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22. "Harm is irreparable 'if it is not fully compensable

by monetary damages' or 'if the nature of the plaintiff's loss would make the damages difficult to calculate.'" *Spangler Candy*, 372 F. Supp. 3d at 607 (quotations omitted). That said, "[t]rademark infringement by nature is generally irreparable and the showing of a high probability of confusion almost invariably gives rise to irreparable harm." *Cent. Benefits Mut. Ins. Co. v. Blue Cross and Blue Shield Ass'n*, 711 F. Supp. 1423, 1434–35 (S.D. Ohio 1989).

But the Court already determined above that Scotts fell short on demonstrating a high probability of confusion. Therefore it must assert other harms. In its reply, Scotts alludes to potential reputational harms. (Doc. 61, #4432–33). Sass also testified to nonmonetary values associated with the Miracle-Gro Trade Dress such as brand loyalty. (Doc. 68, #5610–11). But any potential harm to the Miracle-Gro brand or reputational harm is too speculative at this juncture. Indeed, it appears there are no lost sales to date. (*Id.* at #5525). Scotts has not shown that irreparable injury is *likely* absent an injunction at this point.

## C.    The Balance of Harms Does Not Weigh Significantly One Way or the Other.

In addition to considering the potential harm to Scotts absent an injunction, the Court "must balance the competing claims of injury and must consider the effect on each party of" granting the injunction. *See Winter*, 555 U.S. at 24 (quotation omitted). P&G says that "an injunction would be disastrous" because it would have to recall, redesign, repackage, and reship product, which in turn, would cause its relationships with major retailers to suffer. (Doc. 30, #741–44). But evidence offered at the hearing about potential changes already in progress on Spruce's packaging

suggested that such concerns may be overstated. In any event, the Court concludes that this factor does not weigh strongly one way or the other.

### D. Public Interest Factors Do Not Help Scotts.

Finally, the Court must also consider the public interests at stake. *Winter*, 555 U.S. at 32. The Lanham Act's "two fundamental purposes [are] preventing consumer confusion and deception in the marketplace and protecting the trademark holder's property interest in the mark." *Lorillard Tobacco Co. v. Amouri's Grand Foods, Inc.*, 453 F.3d 377, 383 (6th Cir. 2006); 15 U.S.C § 1127. The Court sees no present risk of consumer confusion. As a result, the Court sees no reason to deprive the public of what P&G claims is a safe and efficacious non-selective herbicide.

\*      \*      \*

On the record before the Court, Scotts has not shown that it has a strong likelihood of succeeding on the merits of its infringement, unfair competition, or dilution claims. Moreover, while it perhaps has made a sufficient showing on that first preliminary injunction factor to at least warrant *considering* all four factors, the remaining factors do not weigh much, if at all, in its favor either. Certainly, the remaining factors do not provide the oomph needed to overcome Scotts' shortfall on the first prong. As a result, the Court finds that preliminary injunctive relief is unwarranted.

### CONCLUSION

For the reasons discussed above, the Court **DENIES** Plaintiffs' Motion for Preliminary Injunction (Doc. 2).

**SO ORDERED.**


June 27, 2025
**DATE**                                  **DOUGLAS R. COLE**
                                          **UNITED STATES DISTRICT JUDGE**