UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

---------------------------------------------------------------- x

POST UNIVERSITY INC.,　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　Plaintiff,　　　　　:　　**MEMORANDUM &**
　　　　　　　　　　　　　　　　　　　　　　:　　**ORDER DENYING**
　　　　-against-　　　　　　　　　　　　　:　　**DEFENDANT'S MOTION**
　　　　　　　　　　　　　　　　　　　　　　:　　**TO PRECLUDE EXPERT**
LEARNEO, INC.,　　　　　　　　　　　　　:　　**TESTIMONY OF DR.**
　　　　　　　　　　　　　　　　　　　　　　:　　**WIND**
　　　　　　　　　　　　Defendant.　　　　:
---------------------------------------------------------------- x　　3:21-CV-01242 (VDO)

**VERNON D. OLIVER**, United States District Judge:

Before the Court is Defendant's motion to exclude the testimony and opinions of Plaintiff's proffered survey expert, Dr. Yoram Jerry Wind, pursuant to Federal Rules of Evidence 403 and 702. The motion was fully briefed after the Court heard oral argument and requested sur-replies.[1] After considering the parties' briefs, exhibits, and testimony, and for the reasons discussed below, Defendant's motion to preclude the expert report and any associated testimony of Dr. Wind is **denied**.

## I.　　BACKGROUND

Defendant Learneo, Inc., a Delaware corporation with a principal place of business in Redwood City, California, operates a website named Course Hero, an online learning platform of course-specific study resources.[2]

Plaintiff commenced this action on September 17, 2021.[3] The Amended Complaint alleges the following causes of action: (1) direct copyright infringement, (2) contributory copyright infringement, (3) vicarious copyright infringement, (4) removal of copyright

---

[1] ECF Nos. 193–195, 202–203, 208, 215–216, 220–222.
[2] Answer, ECF No. 89 ¶¶ 2, 13.
[3] ECF No. 1.

management information ("CMI") in violation of the Digital Millennium Copyright Act ("DMCA"), (5) trademark infringement in violation of the Lanham Act, (6) false designation of origin in violation of the Lanham Act, (7) violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), (8) unjust enrichment, and (9) common law unfair competition.[4] It further alleges that Plaintiff's intellectual property include copyrights and trademarks registered with the United States Patent and Trademark Office ("USPTO").

In support of its Lanham Act and DMCA claims, Plaintiff retained Dr. Wind to conduct, analyze, and opine on prospective consumer confusion.[5] Dr. Wind utilized two separate surveys. **First**, in Dr. Wind's Opening Report dated February 13, 2024, he analyzed whether prospective consumers of the Course Hero website believe Post University documents on, or downloaded from, the Course Hero website to be owned and/or authored by Course Hero based on the Course Hero logos, banners, ads, copyright notices, watermark, footers, and other Course Hero-identifying information on and/or near the Post University documents on the website.[6] Dr. Wind obtained data from a sample of 1,350 current and prospective consumers of the Course Hero website (the "respondents"),[7] randomly divided the respondents into groups of 150 who were then assigned to review and answer questions regarding one of the nine test or control stimuli,[8] which are listed in Table A of Dr. Wind's Opening Report.[9] To test whether respondents were confused as to the author and/or owner of a Post document, Dr. Wind created a questionnaire with ten questions (including sub-parts asking for explanations related to the

---

[4] First Am. Compl., ECF No. 31 ("FAC")
[5] Wind Ex. A (Initial Report), ECF No. 202-2 ¶ 1.
[6] *Id.* ¶ 2
[7] *Id.* ¶ 13
[8] *Id.* ¶ 92.
[9] *Id.* at 41–43.

respondents' answers).[10] The survey responses were analyzed by two independent coders from Illume, a marketing research firm, who were instructed by Dr. Wind on how to determine whether a respondent was to be deemed "confused" or "not confused."[11]

**Second**, in Dr. Wind's Rebuttal Expert Report dated April 23, 2024, he analyzed the relevance and validity of the opinions in one of Defendant's retained experts, Dr. Frederiksen-Cross, that metadata alone cannot reliably be used to identify the actual author and title of a document and that metadata may not have any useful information.[12] Specifically Dr. Wind also provided a re-tabulation of the open-ended responses in the Initial Report.[13] The methodology employed by Dr. Wind included the following differences from his initial survey: (1) Dr. Wind shortened his questionnaire to only those questions relevant to his Rebuttal Survey, and (2) Dr. Wind created two new control stimuli.[14] Dr. Wind's Rebuttal Survey obtained data from a sample of an additional 900 respondents (each control stimulus was tested with 150 respondents).[15]

## II.  **LEGAL STANDARD**

Federal Rule of Evidence 702 provides that a qualified expert "may testify in the form of an opinion" if the proponent of the expert demonstrates to the Court that "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion

---

[10] *Id.* at 45–50.
[11] ECF No. 147-1 ¶ 12.
[12] Wind Ex. D (Rebuttal Report), ECF No. 202-5 at 6 ¶ 1.
[13] *Id.* ¶ 2.
[14] ECF No. 203 at 19.
[15] *Id.* at 21.

reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702.

District courts perform a "gatekeeping" function in deciding whether an expert's testimony is admissible under Rule 702, *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993), one that operates within the "liberal standard of admissibility" embodied by Rule 702. *See Nimely v. City of New York*, 414 F.3d 381, 395–96 (2d Cir. 2005). In defining the gatekeeping role of the Court, the Second Circuit has distilled Rule 702's requirements into three broad criteria: (1) qualifications, (2) reliability, and (3) relevance and assistance to the trier of fact. *Id.* at 396–97.

Whether the witness is "qualified by knowledge, skill, experience, training, or education to render his or her opinions as an expert" is a "threshold matter" that courts consider before analyzing the relevance and reliability of the testimony itself. *Vale v. United States*, 673 F. App'x 114, 116 (2d Cir. 2016) (citing *Nimely*, 414 F.3d at 396 n.11). A witness is qualified where he or she has "superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004). However, the Second Circuit has indicated that an expert's knowledge need not be perfectly tailored to the facts of the case. *See Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 81–82 (2d Cir. 1997). "If an expert has educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent." *Tardif v. City of New York*, 344 F. Supp. 3d 579, 598 (S.D.N.Y. 2018).

If an expert meets the threshold requirement of qualification, the Court then must determine whether the expert's testimony itself is reliable. In *Daubert*, the Supreme Court identified several factors that may be considered in assessing reliability:

> (1) whether a theory or technique "can be (and has been) tested," (2) "whether the theory or technique has been subjected to peer review and publication," (3) a technique's "known or potential rate of error," and "the existence and maintenance of standards controlling the technique's operation'" and (4) whether a particular technique or theory has gained "general acceptance" in the relevant scientific community.

*Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) (quoting *Daubert*, 509 U.S. at 593–94) (internal quotation marks and citations omitted). These factors, however, do not constitute a "definitive checklist or test." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999). Instead, the inquiry is a flexible one and must be "tied to the facts of a particular case" with attention to "the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Id.*; *see also Nicholas v. Bratton*, 376 F. Supp. 3d 232, 290 (S.D.N.Y. 2019) (stating that "[w]here a proposed expert witness bases his testimony on practical experience rather than scientific analysis . . . courts recognize that [e]xperts of all kinds tie observations to conclusions through . . . general truths derived from . . . specialized experience") (internal quotation marks and citations omitted).

Next, in addition to ensuring that expert testimony is reliable, the Court must decide whether the expert's testimony is relevant, *i.e.*, whether it will "help the trier of fact." *In re Mirena IUD Prod. Liab. Litig.*, 169 F. Supp. 3d 396, 413 (S.D.N.Y. 2016). Like other forms of evidence, expert testimony is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. "Once the thresholds of reliability

and relevance are met, the testimony is admissible. Thereafter, any purported weakness in an expert's methodology or conclusion goes to the degree of credibility to be accorded to the evidence, not to the question of its admissibility." *Royal Ins. Co. of Am. v. Joseph Daniel Const. Inc.*, 208 F. Supp. 2d 423, 426 (citing *Ambrosini v. Labarraque*, 101 F.3d 129, 133-35 (D.C. Cir. 1996)).

III.    **DISCUSSION**

Defendant moves to exclude Dr. Wind's testimony, asserting that: (1) his surveys were fundamentally flawed as they improperly excluded educators during the screening portion, (2) his surveys were unreliable as they relied on unclear and undefined terms, including "document," "material," and "owns," (3) his initial survey used improperly designed controls, (4) his coding results could not be replicated, (5) his understanding of the definition of CMI was incorrect, and (5) his conclusions are based on an unreliable application of his methodology. As discussed below, because Defendant fails to show that Dr. Wind's surveys are methodologically unsound, the Court denies the request for exclusion.

A.    **Dr. Wind's Qualifications**

A witness may be classified as an expert based upon personal experience alone. *Frederick v. Deco Salon Furniture, Inc.*, No. 16-CV-60, 2018 WL 2750319, at *3 (D. Conn. Mar. 27, 2018). "When considering an expert's 'practical experience and educational background as criteria for qualification, the only matter the court should be concerned with is whether the expert's knowledge of the subject is such that his opinion will likely assist the trier of fact in arriving at the truth.'" *SLSJ, LLC v. Kleban*, No. 14-CV-390 (CSH), 2017 WL 4329732, at *4 (D. Conn. Sept. 29, 2017) (quoting *Valentin v. New York City*, No. 94-CV-3911, 1997 WL 33323099, at *14 (E.D.N.Y. Sept. 9, 1997)).

Defendant has not attempted to challenge Dr. Wind's qualifications, nor could it. Dr. Wind is the Lauder Professor Emeritus and Professor of Marketing at the Wharton School of the University of Pennsylvania, having taught graduate courses relating to executive development and marketing since 1967,[16] and worked as Director for the SEI Center for Advanced Studies in Management.[17] As part of a career spanning over four decades, Dr. Wind has been qualified as a marketing and survey research expert in federal court, where he has conducted and evaluated marketing and consumer research for use in litigation.[18] The Court therefore finds that Dr. Wind is qualified to provide expert testimony on consumer confusion as it relates to Plaintiff's claims against Defendant.

### B.    Reliability of Dr. Wind's Testimony

"In deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Amorgianos*, 303 F.3d at 267. At a minimum, "[a]n expert opinion requires some explanation as to how the expert came to his conclusion and what methodologies or evidence substantiate that conclusion." *Riegel v. Medtronic, Inc.*, 451 F.3d 104, 127 (2d Cir. 2006), *aff'd on other grounds*, 552 U.S. 312 (2008). Finally, this Court has "considerable leeway in deciding" how it will go about determining the reliability of proffered expert testimony. *Kumho*, 526 U.S. at 152.

---

[16] Ex. A, ECF No. 202-2 ¶ 4.
[17] *Id.* ¶ 7.
[18] *Id.* ¶ 9.

1. **Defendant's Allegations that the Surveys Improperly Excluded Educators**

The Court finds that Dr. Wind's omission of educators for the survey respondent groups is not a valid basis to exclude his testimony.

Defendant contends that Dr. Wind improperly excluded educators from the surveys, as they are one of Defendant's only two target demographics. According to Defendant, excluding educators compromises the probative value of the survey because it fails to capture the responses from all potential consumers of Course Hero. While "[i]t is well established that a flawed universe minimizes the probative value of a survey and may lead to skewed results,'" *Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*, 97 F. Supp. 3d 485, 510 (S.D.N.Y. 2015), it is also well established that "[e]rrors in survey methodology generally 'go only to the weight of the evidence—subject, of course, to Rule 403's more general prohibition against evidence that is less probative than prejudicial or confusing.'" *Bustamante v. KIND, LLC*, 100 F.4th 419, 427 (2d. Cir. 2024) (quoting *Schering Corp.* v. *Pfizer Inc.*, 189 F.3d 218, 228 (2d Cir. 1999). Here, the purported testing of the wrong universe, as Defendant suggests, does not indicate that the surveys' probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. Fed. R. Evid. 403. Defendant's sweeping contention that educators must be included in the universe is belied by evidence showing that college educators made up only a fraction of Court Hero's accountholders in 2021, including statistics that educators make up less than 1% of account holders,[19] and testimony from Defendant's VP of Marketing stating that "there are a lot more students than there are

---

[19] ECF No. 221 at 91.

educators."[20] Further, Defendant does not seriously dispute Dr. Wind's explanation that it is generally accepted and custom to exclude individuals who works in the same industry as the survey that is being conducted.[21] It is thus appropriate for Defendant to raise its criticisms about the survey's academia-based exclusion before the jury. *Doctor's Assocs., Inc. v. QIP Holder LLC*, No. 06-CV- 1710 (VLB), 2010 WL 669870, at *11 (D. Conn. Feb. 19, 2010).

### 2.    Defendant's Allegations of Ambiguous Terms

Defendant's second contention—that the failures to define "document," "material," and "owns" undermine the probative value of the surveys—is misplaced. To illustrate, Defendant contends that the survey questions using these terms are ambiguous because almost all of the test stimuli show one document (the Post University material) within another document (the Course Hero webpage), and then ask questions about the "document":

**Excerpt from Initial Survey Test Stimulus 3**



---

[20] Ex. OO (Nesbit Dep.), ECF No. 202-43, at 2–3.
[21] Wind Decl., ECF No. 202-1, ¶ 14.

Defendant asserts that the use of the terms "document" and "material" interchangeably in Dr. Wind's survey make it impossible to discern whether survey respondents understood "document" or "material" in the question to mean the alleged Post University material (green), the Course Hero webpage (red), or something else entirely.

Cases from this Circuit reflect the necessity of precluding testimony related to surveys when the flaws are so egregious as to undermine the probative value of a survey—e.g., when there is an "obvious leading question" that "suggested its own answer," *Universal City Studios, Inc. v. Nintendo Co., Ltd.*, 746 F.2d 112, 118 (2d Cir. 1984), or when there are leading questions that "invite guessing by those who did not get any clear message at all," *Procter & Gamble Co. v. Ultreo, Inc.*, 574 F. Supp. 2d 339, 352 (S.D.N.Y. 2008). Defendant lists several instances in which courts exclude surveys that use questions with undefined, ambiguous terms. *Malletier v. Dooney & Bourke, Inc.* ("*Vuitton I*"), 525 F. Supp. 2d 558, 604 (S.D.N.Y. 2007) (finding confusion survey inadmissible where the survey's second main question used a "highly ambiguous" term); *de Lacour v. Colgate- Palmolive Co.*, No. 16-CV-8364 (KMW), 2024 WL 36820, at *5 (S.D.N.Y. Jan. 3, 2024) (finding report and testimony inadmissible where "no meaningful conclusion can be drawn from respondents' answers" due to the failure to provide respondents with adequate definitions of certain terms); *Edmondson*, 2020 WL 1503452, at *8 (finding undefined terms undermined the reliability of the responses to survey questions). But this case is distinguishable and does not demand preclusion on this ground. It would be too wide a stretch for this Court to conclude that the failure to define "document" and "materials," which are terms that jurors will have necessarily dealt with throughout their lives, would undermine the probative value of the survey. The simplicity of the terms being challenged here is drastically different from the terms found ambiguous in *Vuitton I* ("some

business relationship"), *de Lacour* ("artificial" and "natural"), and *Edmondson* ("lifestyle" and "events"). Accordingly, the Court concludes that undue prejudice does not substantially outweigh the probative value of the survey on this ground under Fed. R. Evid. 403 and thus, a jury can evaluate the weight given to the survey.

Defendant next contends that the term "owns," as used in Dr. Wind's survey, is improper for being ambiguous and for asking the survey respondents to opine as to a legal question. Specifically, Defendant asserts that, because § 1202(a) of DMCA concerns whether a party has falsely represented itself as the owner of the **copyright** in a work, Dr. Wind directly asked the respondents to provide a legal conclusion by asking them, "Do you have a belief as to who **owns** this document?" and, "Who do you believe **owns this document?"** But, again, it is a stretch to conclude that, in the absence of a definition from Dr. Wind, the survey respondents would not have an understanding of the concept of "ownership." "Ownership" is a relatively simple concept, and certainly every respondent had an understanding of the term "own," which means "to keep, control, or experience as one's own."[22] The survey did not present respondents with the legal issue of copyright ownership; rather, it asked the respondents to provide their impressions about who they believed to "own" a document. Thus, the term "owns," bears no resemblance to the spectrum of cases cited by Defendant where exclusion was warranted due to an ambiguous term. And while Defendant asserts that it is irrelevant whether respondents were confused as to the ownership of copies of Plaintiff's documents, Defendant overlooks the issue of standing. As explained in the Court's summary

---

[22] *Own*, Merriam-Webster, https://www.merriam-webster.com/thesaurus/own (citing examples as "we own a modest house and an equally modest car").

judgment opinion, the misattribution of Plaintiff's works can be a concrete injury to confer standing as to Plaintiff's DMCA claims.

### 3.    Defendant's Allegations of Improper Controls

The Court finds, too, that Defendant's critiques of Dr. Wind's control stimuli are overstated. Defendant contends that Dr. Wind's initial survey is unreliable as the control stimuli failed to isolate the alleged elements of the Course Hero website underlying any of Plaintiff's claims, thus making it impossible to determine which elements, if any, contributed to confusion. Further, Defendant argues that Dr. Wind's control stimuli removed an excessive amount of Course Hero website elements and improperly added a sentence, unilaterally drafted by Dr. Wind, to the footer of the stimuli, which stated, "Course Hero did not author and does not own this study resource." On the issue of excluding a survey due to a flawed control, the Court agrees with Plaintiff. "[T]he fact that a survey used a control that could have been 'stronger' or 'better' may mean it is entitled to less weight, it does not mean that the survey does not provide relevant information." *Gucci Am., Inc. v. Guess?, Inc.*, 831 F. Supp. 2d 723, 740 (S.D.N.Y. 2011). To be clear, consistent with Defendant's contention, the absence of an effective control could certainly be a factor that damages the reliability of a survey. In *THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218, 240 (S.D.N.Y. 2010), it was the combined effect of failing to reflect actual marketplace conditions and failing to include an effective control designed to estimate the degree of error in the survey, not the independent effect of either flaw, that led to exclusion of the survey. *Id.; see also Vuitton I*, 525 F. Supp. 2d at 597 (finding a host of issues with a confusion survey). No such combinations of major flaws are found here. Thus, while a factfinder may not give Dr. Wind's testimony much weight due to his removal of elements of the Course Hero website and addition of the footer, "neither science nor law

mandate the [requested] exclusion" here. *Gucci Am., Inc.* 831 F. Supp. 2d at 740 (denying request to exclude "a survey that uses a single control to measure association attributable to an allegedly infringing multi-element" website).

### 4. Defendant's Allegations of Dr. Wind's Unreliable Coding Methodology

Nor does the Court find that Defendant provides a sufficient foundation to enable the Court to conclude that Dr. Wind's coding methodology is completely unreliable as to warrant preclusion.

Defendant identified two theories upon which Dr. Wind's coding methodology is unreliable. First, Defendant argues Dr. Wind's coding instruction do not provide sufficient guidance to produce reliable results, as Dr. Wind was unable to reproduce his coders' classifications based on his own coding instructions. Specifically, Defendant notes that Dr. Wind was only able to match his coders' classifications four out of fourteen times (28.6%) during a deposition. Second, Defendant argues that Dr. Wind failed to properly to isolate the alleged CMI, as his understanding of the definition of CMI was incorrect. Specifically, Defendant argues that Dr. Wind provided his coders with CMI "guidelines" that are inconsistent with the definition of CMI in § 1202 of the DMCA.

Defendant showing Dr. Wind struggling to make consistent coding determinations as to a handful of responses during a deposition does not meet the threshold to exclude expert testimony: that "there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). "[G]aps or inconsistencies in the reasoning leading to [an expert's] opinion" frequently "go to the weight of the evidence, not to its admissibility." *Restivo v. Hessemann*, 846 F.3d 547, 577 (2d Cir. 2017). While it may

be that it was impossible for Defendant to question Dr. Wind about 2,250 respondents during a deposition, the emphasis on ten purported testimonial errors by Dr. Wind does not show that the methodology used was completely unreliable. Defendant did not conduct its own survey showing inconsistent results with Dr. Wind's results and failed to show that it is impossible to reproduce Dr. Wind's coding scheme.

Defendant's allegation that Dr. Wind's understanding of CMI was overly broad similarly fails to establish that there was unreliable coding methodology. "CMI is broadly defined as eight categories of 'information conveyed in connection with copies or phonorecords of a work or performances or displays of a work.'" *Bounce Exch., Inc. v. Zeus Enter. Ltd.*, No. 15-cv-3268, 2015 WL 8579023, at *2 (S.D.N.Y. Dec. 9, 2015).[23] As relevant here, Dr. Wind instructed his coders to look for the following categories of information in the "confused" responses to the test stimuli: Course Hero Logo, Course Hero Advertisement, Course Hero Banner Ads, Course Hero Copyright Notice, Course Hero Website / Link, Course Hero Watermark, Course Hero name on document, and Course Hero Other.[24] Thus, Dr. Wind's guidance to his coders is wholly consistent with the plain text of the DMCA, which defines CMI as information "**conveyed in connection with**" copies of a work, including "**other information identifying the work**[.]" 17 U.S.C. § 1202(c)(1) (emphasis added). There is no inconsistency with the broad language in the DMCA, such as the term "conveyed," which

---

[23] Section 1202 defines CMI as certain enumerated categories of information "conveyed in connection with" copies of a work, including "[t]he title and other information identifying the work," "[t]he name of, and other identifying information about, the author of the work," "[t]he name of, and other identifying information about, the copyright owner of the work," "the terms and conditions for use of the work," and "[i]dentifying numbers or symbols referring to such information or links to such information." 17 U.S.C. § 1202(c).

[24] ECF No. 147-1 ¶ 35.

"merely requires that the information be accessible in conjunction with, or appear with, the work being accessed."[25]

### 5.    Defendant's Allegations of Dr. Wind's Faulty Conclusions

Finally, the Court is not persuaded that Defendant has shown that Dr. Wind's conclusions are unreliable.

First, Defendant argues that Dr. Wind's opinion as to CMI confusion fails to account for background noise in the control stimulus. Specifically, Defendant argues that several of the control stimuli contained the Course Hero footer watermark, which Plaintiff alleges to be false CMI. But that contention does not show that Dr. Wind's findings are "speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison." *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp.*, LLC, 571 F.3d 206, 214 (2d Cir. 2009). As the Second Circuit has held time and again, gaps or inconsistencies in the reasoning of an expert frequently go to the weight of the evidence, not to its admissibility. *Restivo*, 846 F.3d at 577; *Campbell ex rel. Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d 179, 186 (2d Cir. 2001).

Second, Defendant argues that Dr. Wind's reported measures of trademark confusion are below the level that courts require for experts to opine that there is a likelihood of confusion, i.e., 15%. But Defendant does not offer any binding law for the proposition that an expert must be precluded from testifying if a survey's overall confusion is less than 15%. Any contention regarding "statistical imperfections . . . affect[] the weight accorded to the evidence rather than its admissibility." *Lion Oil Trading & Transp., Inc. v. Statoil Marketing and*

---

[25] Order Denying Motion to Dismiss, ECF No. 86 at 7–8 (citing *Janik v. SMG Media, Inc.*, No. 16-CV-7308, 2018 WL 345111, at *12 (S.D.N.Y. Jan. 10, 2018)).

*Trading (US) Inc.*, No. 08-CV-11315, 2011 WL 855876, at *4 (S.D.N.Y. Feb. 28, 2011) (citing

*Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 259 (2d Cir. 1987)).

## IV.  <u>CONCLUSION</u>

For the reasons described above, Defendant's motion to exclude Dr. Wind's testimony

and opinions is **denied**.

**SO ORDERED.**

Hartford, Connecticut
September 23, 2025

<u>/s/Vernon D. Oliver</u>
VERNON D. OLIVER
United States District Judge

16